CHADD MCLAUGHLIN, APPELLEE, V. REBECCA L. MCLAUGHLIN,
NOW KNOWN AS REBECCA L. SHEETS, APPELLANT.

647 N.W.2d 577

Filed June 28, 2002. No. S-01-1137.

Clarence E. Mock III and Denise E. Frost, of Johnson & Mock, for appellant.

John S. Slowiaczek and Willow T. Head, of Lieben, Whitted, Houghton, Slowiaczek & Cavanagh, P.C., L.L.O., for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

CONNOLLY, J.

## I. NATURE OF CASE

Rebecca L. McLaughlin, now known as Rebecca L. Sheets, is a custodial parent who has remarried and wishes to move to Huron, South Dakota, with her child because of her new husband's employment. Chadd McLaughlin, her former husband and father of the child, opposed the application for removal, and the district court denied Rebecca's application. She appeals. We determine that Rebecca satisfied her burden of showing a legitimate reason for the removal and that it was in the best interests of the child to continue living with her. Accordingly, we reverse.

## II. BACKGROUND

The parties' marriage was dissolved in April 1999. In the decree, Rebecca and Chadd were awarded joint legal custody of their daughter, who was almost 4 years old at the time the application for removal was filed. Rebecca was awarded primary physical custody. Chadd was given reasonable and liberal visitation. He was not granted extended summer or holiday visitation. Beginning in May 2001, the parties agreed to a visitation schedule that gave Chadd custody from Thursday evening to Sunday evening, every other weekend.

In April 2000, Rebecca married Clayton Sheets. She stated that she continued to work because they needed her income. She earned about $22,000 in the year 2000. She quit her job in May 2001 to stay home with her daughter, and she and Clayton had a daughter in June 2001.

Clayton testified that soon after Rebecca and Clayton were married, he began searching for a new job so that he could earn enough income for Rebecca to stay home. His background and experience were in agriculture. He earned his bachelor's degree in agricultural sciences in 1996. When they married, he worked as an agronomist for a national farmers' cooperative in Gretna, Nebraska. His duties included scouting fields and giving farmers recommendations on their crops, and he also sold seed and chemicals to farmers. In addition, he was required to perform long hours of manual labor at the farmers' cooperative during the spring and summer. His annual base salary was $31,000, and he received $6,500 in bonuses for the year 2000. He stated that he had virtually no opportunity for advancement.

Clayton looked for new employment in Nebraska, but the only offers he received were for farmers' cooperative positions similar to the one he held in Gretna. He applied to some of the larger seed companies but did not receive an offer. He was offered an outside sales position in Omaha with an insurance company that paid $50,000 annually. He stated that he did not accept the position because it did not provide benefits; required considerable travel; and required him to provide his own vehicle and pay for all of his travel expenses, including food, gas, and hotels.

In June 2001, Clayton received an offer from Garst Seed Company in Huron, South Dakota, for a district sales manager

position. The company required an answer within a week, and he accepted. Clayton testified that his annual base salary with Garst Seed was $45,000 and that his new job offered scheduling flexibility, a home office, company car, and benefits. He was confident that he could earn enough in bonuses to exceed the income he and Rebecca had earned together while in Nebraska.

On July 6, 2001, Rebecca filed an application for removal and requested an expedited hearing because Clayton was to start at his new job on July 17. In his response, Chadd denied that the removal was in the child's best interests and cross-applied for physical custody. Rebecca also filed a motion for temporary removal or, alternatively, a trial date for the end of August. The court denied the motion for temporary removal, and trial was held on September 10.

At some point between Clayton's acceptance of the new position and the trial, Clayton and Rebecca sold their home in Papillion and purchased a new home in Huron. Rebecca stated that Huron is about a 4- to 4½-hour drive from the Omaha area. Clayton moved to Huron to begin his job. The record reflects that Rebecca and the children stayed in Huron for visits before the hearing and that she was able to describe the community and their new home to the court. She testified, however, that she was still living with her children at her parents' home in Elkhorn, Nebraska.

She described the neighborhood as quiet and friendly with an elementary school within a couple of blocks of their home. She stated that the new home cost no more than their old home but had an additional bedroom and had twice as much square footage. She believed that the cost-of-living in general was lower in Huron than in Omaha. She also stated that her daughter got along well with Clayton and her new half sister. She maintained that the loss of contact with her family in Omaha would be offset by the benefits of their new community and improved lifestyle. She stated that her family already had plans for visits and that she would visit Omaha frequently to see them. The record reflects that Huron is a city of 12,000 people.

Regarding Chadd's visitation, she testified that she would maintain the same visitation schedule until the child began kindergarten. She was also willing to meet Chadd halfway every

other weekend to shorten the drive time for him. After the child began school, she proposed an extended summer visitation of 5 weeks to compensate for the shortened weekend visitations.

Rebecca was asked what she would do if the court denied the removal, and she stated, "If it came to that, we would have to move back . . . ." She stated that she would not give up custody if the court denied the application because she did not believe it was in the child's best interests to live with Chadd. She stated the child's best interests were to continue living with her because she could stay home with her children in South Dakota and the family's lifestyle and home would be improved by Clayton's new position. She also asserted that her children would be safer in Huron than in Omaha. Finally, she testified that because of their increased disposable income, she and Clayton could save for their children's college educations, which they could not afford to do in Omaha.

On cross-examination, she stated she and Clayton did not inform Chadd that they intended to move to South Dakota until after Clayton had accepted the position, but before they had sold their house. Rebecca also stated that Clayton had not inquired about two Garst Seed positions that became available in Nebraska after he had accepted the Huron position because the positions were an extension of the territories for only existing representatives and were not available to new employees.

Chadd testified that he was told about Clayton's new job in South Dakota sometime between June 25 and 30, 2000. He stated that at that time, Clayton had already accepted the job, but Chadd did not believe the house was listed for sale yet. He maintained that Rebecca had already moved to South Dakota because he had received a telephone call from his daughter while she was there. Rebecca had also left a telephone message once stating that they were going to South Dakota. But he could not point to specific time periods when he thought she was there. He stated that he was not asking for custody of his daughter, but only asking the court to deny her removal from the jurisdiction, and that if the court denied the removal, and Rebecca still wanted to leave, he would assume custody.

Chadd asserted that it was in the child's best interests to remain with him in Elkhorn because he enjoyed a close relationship with

her and she was also very close to his stepson. He was concerned that he could not maintain his daily contact with his daughter if Rebecca's application were granted. In addition to his visitation, he alternated picking up and dropping off his daughter at preschool on the 2 days a week that she attended, and he picked her up from daycare on his visitation days.

Chadd believed that his daughter should not be separated from her extended family in the Omaha area. He stated that his sister was currently living with him and that his present wife's family lived in Elkhorn. He stated that Rebecca's and Clayton's extended families lived in the Omaha area also. His own parents lived in Hebron, however, and saw the child about once a month. Other than his sister, he admitted that he had no extended family in the Omaha area. He also admitted that he did not currently take the child to see any members of Rebecca's family when he had custody.

An attorney appointed by the court to serve as the guardian ad litem testified that he had observed the child in Chadd's home and at Rebecca's parents' home. He generally found that the child interacted well with both families. Just before testifying, he had observed a report from Joseph L. Rizzo, Ph.D., a clinical psychologist whom Chadd hired as an expert. He admitted that Rizzo had recommended that the court grant the application because (1) the child's primary bond was with Rebecca, (2) Rebecca was seeking to enrich her life and care for her child, and (3) Clayton's job in Huron was consistent with his training and future stability. Chadd did not call Rizzo as a witness.

Despite Rizzo's recommendations, the guardian ad litem recommended that the court deny the application for removal. He testified that he made his recommendation because Clayton was not required to move to South Dakota. He agreed that the child would be fine moving with her mother, but he thought that Clayton's desire "to better his position financially [was] not a sufficient reason to separate a child from her father."

Rebecca's expert witness, Kevin R. Cahill, Ph.D., a clinical psychologist specializing in marriage and family therapy, interviewed Rebecca and Chadd separately twice, alone and with their daughter. Although he found Chadd to be a loving and competent father, he stated that the child had developed a stronger

relationship with Rebecca. He believed that because Rebecca had been her primary caretaker during her infancy, the child's primary attachment was with her. He stated that both parents responded well to their child's demands and expectations for her developmental age and level and could relegate their needs to her needs. But he stated that when a child is removed from its primary attachment parent, there are a number of negative psychological effects.

Cahill opined that the potential gains weighing in favor of the removal were an improved quality of life, more time and attention from Rebecca, and a quieter, easier lifestyle. He stated that it was in the child's best interests—in terms of her security and stability—for Rebecca to stay home. The potential harm was the loss of frequent interaction with Chadd. But he stated that the loss was mitigated by Rebecca's stated willingness to maintain the visitation schedule and provide Chadd with visits when she returned to see her family and for extended visits in the summer. He stated she would not be harmed by the decreased weekend visitation with Chadd when she started school. He stated that with longer visitation in the summer, the density of the contacts with Chadd could actually be greater.

Cahill saw no indication that Rebecca had applied for the removal with the intent of damaging the child's relationship with Chadd. He also reviewed Rizzo's report while on the stand and stated that those recommendations were consistent with his own. Cahill opined it was in the child's best interests to be allowed to move to South Dakota.

After the parties' closing arguments, the court rendered its judgment from the bench. The court stated that this court had not decided whether a career improvement for a custodial parent's spouse could constitute a legitimate reason for leaving the jurisdiction. Nonetheless, the court found that Rebecca had a legitimate reason for the removal. Similarly, the court did not question Rebecca's motives for seeking the removal. The court believed, however, that Rebecca had already moved, and found it significant that Rebecca had not talked to Chadd before searching for a job, listing their home, or moving. The court recognized that the move considered and affirmed in *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999), was from Omaha to Denver,

but found this case distinguishable because the custodial parent's career prospects were improved in *Farnsworth*.

The court next considered the potential that the move held for enhancing the quality of life for the child and the custodial parent. It found that (1) the child's emotional and physical needs would be equally met with either Rebecca or Chadd, (2) the child was too young to express a preference, (3) Rebecca's income would not be enhanced because the income belonged to Clayton, (4) the housing and living conditions would be improved, and (5) the education advantages in Huron were no greater than in Omaha. It made no specific finding regarding the quality of the child's relationship with each parent.

The court further found that Cahill had conceded that a substantial reduction in time with Chadd would negatively affect the child and that the family ties were in Nebraska, not South Dakota. The court stated that it could not decide whether the move would antagonize the relationship between the parties. The court believed that Clayton could find work in Nebraska. Based on these findings, the court determined that it was not in the child's best interests to move to South Dakota and denied the application.

### III. ASSIGNMENTS OF ERROR

Rebecca assigns that the district court erred in finding that she had not satisfied her burden of proving that the removal to Huron was in the child's best interests and in denying the application for removal.

### IV. STANDARD OF REVIEW

■ Child custody determinations, and visitation determinations, are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *Vogel v. Vogel*, 262 Neb. 1030, 637 N.W.2d 611 (2002).

■ A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrains from acting, and the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through

a judicial system. *Bauerle v. Bauerle*, 263 Neb. 881, 644 N.W.2d 128 (2002).

## V. ANALYSIS

In order to prevail on a motion to remove a minor child to another jurisdiction, the custodial parent must first satisfy the court that he or she has a legitimate reason for leaving the state. After clearing that threshold, the custodial parent must next demonstrate that it is in the child's best interests to continue living with him or her. *Vogel, supra.*

### 1. LEGITIMATE REASON TO LEAVE STATE

The court found that Rebecca had a legitimate reason for removal, but also found that Clayton could find work in Nebraska. This court has previously determined that a career enhancement for a custodial parent's spouse is a legitimate reason for removal when the career change occurred after a remarriage. See, *Harder v. Harder*, 246 Neb. 945, 524 N.W.2d 325 (1994); *Demerath v. Demerath*, 233 Neb. 222, 444 N.W.2d 325 (1989). See, also, *Little v. Little*, 221 Neb. 870, 381 N.W.2d 161 (1986). Further, this court has stated:

> [W]e have never required a custodial parent to exhaust all possible job leads locally before securing a better position in another state. Absent some aggravating circumstance, such as an ulterior motive to frustrate the noncustodial parent's visitation rights, significant career enrichment is a legitimate motive in and of itself.

*Farnsworth v. Farnsworth*, 257 Neb. 242, 252-53, 597 N.W.2d 592, 600 (1999). Because we have held that career advancement for the custodial parent can constitute a legitimate reason for removal, our holding in *Farnsworth* applies equally to the spouse of a custodial parent.

Although Clayton was offered employment in Nebraska with an insurance company, the position was not in an area in which he had experience and required him to incur significant expenses and travel time. There was no requirement in *Harder* that the new spouse search for employment outside of his field. Clayton testified that he had been unable to find a position that offered career advancement in Nebraska and that his new position offered sig-

nificant opportunities in his chosen field. He was not required to accept work outside of his field. The court acknowledged that the career change was a considerable advancement for Clayton. We conclude that Rebecca has shown a legitimate reason for removal.

## 2. CHILD'S BEST INTERESTS

Rebecca contends that the court erred in finding that she had already moved to Huron and in failing to find that the move was in her daughter's best interests. Chadd contends that Rebecca acted in bad faith under the parenting plan by failing to consult him before Clayton accepted this position or making a decision to move. He also contends that the court correctly found that Rebecca had failed to prove that removal was in their daughter's best interests.

In determining whether removal to another jurisdiction is in the child's best interests, the trial court considers (1) each parent's motives for seeking or opposing the move; (2) the potential that the move holds for enhancing the quality of life for the child and the custodial parent; and (3) the impact such a move will have on contact between the child and the noncustodial parent, when viewed in the light of reasonable visitation. *Vogel v. Vogel*, 262 Neb. 1030, 637 N.W.2d 611 (2002).

### (a) Each Parent's Motives

The court determined that because the parenting plan called for both parents to have expansive contact with their daughter, Rebecca and Clayton should have consulted Chadd before searching for a job out of state, or listing and selling their home.

This court has never required custodial parents to consult with their ex-spouses before considering out-of-state employment. To expect consensus on such an issue is unrealistic. The parties' personal interests in removal situations are almost always at odds. The parties did agree in their parenting plan that it was in the best interests of their daughter that both parents maintain an ongoing involvement to the greatest extent possible. But such agreements cannot be interpreted as a mandate for the custodial parent to seek permission from his or her divorced spouse over future career choices. Chadd testified that Rebecca and Clayton informed him of the job offer about the end of June,

which was very shortly after the offer was made. The court erred in its finding that Rebecca was required to consult with Chadd before Clayton could consider out-of-state employment.

■ The court also found that Rebecca had already moved to South Dakota with her daughter, in violation of our rule set out in *Jack v. Clinton*, 259 Neb. 198, 609 N.W.2d 328 (2000). One issue in *Jack* was temporary removals. But that concern was directed toward trial courts and intended to discourage them from granting temporary permission for removal before holding a full hearing and ruling on permanent removal. Further, the evidence does not support the court's finding that Rebecca had moved. Although Clayton moved before the hearing to begin his job, Rebecca testified that she was living with her children at her parents' house. Despite Chadd's belief that she had already moved, he could not point to specific time periods that Rebecca and his daughter were in South Dakota. He testified that Rebecca had not interfered with his visitation times. Rebecca was not prohibited from making living arrangements in South Dakota if the court approved the removal. See *Harder v. Harder*, 246 Neb. 945, 524 N.W.2d 325 (1994) (noting that by time of hearing, both custodial parent and spouse had obtained employment and leased home out-of-state). On the contrary, such efforts can assist the trial court in evaluating the merits of the removal.

Rebecca did not interfere with Chadd's visitation by spending time in South Dakota making preparations for a move, and the evidence does not indicate that she intended to avoid the court's jurisdiction. She filed an application for removal within 2 weeks of the position's becoming available to Clayton, and she testified that she would move back to Nebraska if removal were denied. We do not interpret her statement that she would move back to Nebraska to mean that she had moved without court permission, but that she and Clayton would be willing to sell their home in Huron and give up Clayton's job if the court denied the removal. The court erred to the extent that it found that Rebecca had already moved or imputed her preparations as bad faith in evaluating her motives for making the request.

■ The ultimate question in evaluating the parties' motives is whether either party has elected or resisted a removal in an effort to frustrate or manipulate the other party. See *Farnsworth*

*v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999). There is no evidence that either Rebecca or Chadd has acted in bad faith. Clayton's significant career advancement is a compelling motive for Rebecca to seek removal. On the other hand, Chadd's desire to maintain frequent contact with his daughter is an equally compelling motive to resist the move. Their motives are balanced. See *id.*

### (b) Quality of Life

In determining the potential that the removal to another jurisdiction holds for enhancing the quality of life of the parent seeking removal and of the children, a court should consider the following factors: (1) the emotional, physical, and developmental needs of the children; (2) the children's opinion or preference as to where to live; (3) the extent to which the relocating parent's income or employment will be enhanced; (4) the degree to which housing or living conditions would be improved; (5) the existence of educational advantages; (6) the quality of the relationship between the children and each parent; (7) the strength of the children's ties to the present community and extended family there; and (8) the likelihood that allowing or denying the move would antagonize hostilities between the two parties. *Brown v. Brown,* 260 Neb. 954, 621 N.W.2d 70 (2000). This list should not be misconstrued as setting out a hierarchy of factors. Depending on the circumstances of a particular case, any one factor or combination of factors may be variously weighted. *Id.*

We conclude that the court did not err in finding that a 4-year-old child is too young to express a preference between parents. We further conclude that the court did not err in finding that Rebecca had failed to show that schools in their new community would be superior to schools in their Nebraska community. See, *Brown, supra*; *Farnsworth, supra* (educational advantages factor receives little or no weight when custodial parent fails to prove that new schools are superior). We also agree with the court that the quality of housing and living conditions for Rebecca and the child would be improved by the move and that this factor weighs for the removal.

The court found that either parent could meet their daughter's emotional and physical needs. The record confirms that both

parties are loving parents and genuinely concerned with their daughter's needs. The court concluded that it could not tell whether the removal would antagonize the relationship between the parties. The record indicates that the parties have cooperated well in the past regarding their daughter's welfare, and we find no reason to presume that they would not continue to do so despite their dispute over the relocation. See *Brown, supra.* We disagree, however, with the court's findings on other quality of life factors.

### *(i) Enhancement of Income or Employment*

Although the court found that Rebecca had a legitimate reason to relocate, it also found that Rebecca's income could not be increased by Clayton's career opportunities. The court erred in this finding. See *Harder v. Harder*, 246 Neb. 945, 524 N.W.2d 325 (1994). In *Harder*, the facts did not indicate whether the custodial mother's employment opportunities would be improved at all. It was sufficient that her husband's new job held out considerable opportunities for commission income. See *id.* Similarly, there was evidence that Clayton would have ample opportunities for bonuses and commissions, including a letter from his employer outlining the basis for that income. He testified that he could earn more income alone in Huron than he and Rebecca had earned together while in Nebraska. Although Chadd argues that Clayton has no guarantee of his income other than his base salary, a legitimate expectation of income based on commissions can be considered in evaluating the opportunity for enhanced earning potential. See *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999). We conclude that Rebecca satisfied her burden of showing that her income would be enhanced by the move.

### *(ii) Ties to Community and Extended Family*

The court also found that the strength of the child's ties to the present community and extended family there weighed against removal because all of Rebecca's extended family was in the Omaha area and because she had no family in Huron. However, no evidence was adduced concerning the child's relationships with Rebecca's extended family. In any case, Rebecca testified that she and her family had plans to visit often.

Chadd conceded that other than his sister, who was living with him at the time of the hearing, he did not have extended family in the Omaha area. He testified that his parents saw his daughter about once a month and that he could still provide that visitation time with his parents if the removal were granted. Under these facts, this factor receives little weight in our de novo review.

### (iii) Quality of Relationship Between Child and Parents

The court made no specific finding regarding the relationship between the child and each parent. It did note that removal would be beneficial to her relationship with Rebecca and would negatively affect her relationship with Chadd. The effect of the removal, however, must be evaluated in light of the child's relationship with each parent. See *Brown v. Brown*, 260 Neb. 954, 621 N.W.2d 70 (2000) (concluding that because of close relationship and extensive contacts between father and children, this factor weighed against long-distance relocation with mother).

The guardian ad litem reported that the child interacted well with both families. His opinion that removal should be denied was based wholly on his incorrect belief that Clayton's improved financial position was an insufficient reason for removal. Cahill, however, opined that the child had bonded more strongly with Rebecca because Rebecca had been her primary caretaker. He found that Chadd was a loving and competent father and that both parents responded well to the child's demands and expectations. But because of the child's primary bond with Rebecca, he opined that she would benefit from Rebecca's improved lifestyle and ability to stay home with her in Huron.

The court found that Cahill had conceded that a substantial reduction of time with Chadd would negatively affect the child. Contrary to this finding, however, Cahill stated that a child would be affected by a removal which precluded the possibility for contact with a parent. He specifically stated that he did not believe the child's well-being would be negatively affected by the parties' visitation schedule or the reduced weekend visitations once school started. He stated that Rebecca would make every effort to ensure that the child kept a positive relationship with Chadd and that Chadd could actually have a greater density of contacts because of extended summer visitation.

We find it significant that Chadd's own expert, Rizzo, while he did not testify, recommended that the court allow the relocation, in part, because of the child's bond with Rebecca. We conclude that the child's primary relationship is with Rebecca.

### (iv) Quality of Life Conclusion

We determine that the court erred in (1) failing to find that the child's primary relationship was with Rebecca, (2) finding that Rebecca's income could not be enhanced by Clayton's employment opportunities, and (3) finding that the strength of the child's ties to the community and extended family weighed against removal. Under our de novo review, we conclude that Rebecca has satisfied her burden of proving that the removal will enhance the quality of life for her child and herself.

### (c) Impact of Move on Contact Between Chadd and Child

The final consideration in the best interests of the child analysis is the effect of the relocation upon Chadd's ability to maintain a meaningful parent-child relationship with his daughter. This effect must be viewed in light of the court's ability to devise reasonable visitation arrangements. See *Vogel v. Vogel*, 262 Neb. 1030, 637 N.W.2d 611 (2002). Rebecca testified that she is willing to drive halfway to help Chadd maintain the current visitation schedule until school starts. Afterward, when Chadd's weekend visitation is reduced, she is willing to provide extended summer visitation.

We recognize the difficulty that courts face in determining removal issues. In most applications for removal, the frequency of the noncustodial parent's visitation is likely to be diminished by distance. But the relocation here, from Omaha to Huron, involves no greater distance than some moves which could have been made within the state. Compared to some of the more distant relocations this court has considered, the impact on Chadd's visitation is not as great. See, *Brown, supra*; *Kalkowski v. Kalkowski*, 258 Neb. 1035, 607 N.W.2d 517 (2000). Chadd will still have weekend visitation, even if it will be somewhat reduced after the child starts school. We determine that Chadd could maintain a meaningful relationship with his daughter after school starts through a reasonable visitation schedule, which included extended visitation in the summer.

We conclude in our de novo review that Rebecca has satisfied her burden of proving that it is in the child's best interests to continue living with her.

## VI. CONCLUSION

A custodial parent has the burden of proving that he or she has a legitimate reason for removal and that it is in the best interests of the child to continue living with him or her. Once a parent has met that burden, he or she will not be placed in a position of deciding between custody of a child and a career advancement, whether it is his or her own career or the career of a new spouse. See, *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999); *Harder v. Harder*, 246 Neb. 945, 524 N.W.2d 325 (1994). The district court abused its discretion in refusing to grant Rebecca's application for removal. The judgment of the court is reversed. Upon remand, the court is to enter an order granting the application consistent with this opinion.

REVERSED.

STEPHAN, J., dissenting.

I respectfully dissent. I agree with the conclusion of the trial court and the majority that Rebecca established a legitimate reason for relocation through the evidence of Clayton's enhanced employment opportunities in Huron, South Dakota. I also agree with the majority that Rebecca was not required to consult with Chadd before Clayton could consider out-of-state employment and that the evidence does not support a conclusion that she had actually relocated the child to South Dakota at the time of the hearing on her request to do so. I also agree with the majority that there is no evidence of bad faith on the part of Rebecca. That said, I cannot agree that the district court abused its discretion in denying her request to remove the child from this state.

The crux of my position was aptly stated by the trial judge as a preface to his ruling from the bench when he remarked, "Well, this is a painfully close case." My review of the record leads me to precisely the same conclusion. The record discloses two fit, loving, and devoted parents. Both have played active roles in their daughter's life, and each recognizes the importance of the other in her continuing development. Were either of the parties lesser parents, this would be an easier case to judge. However,

the admirable qualities exhibited by each parent make it an extremely difficult one.

Because a legitimate reason for the relocation was established, the case turns on the "best interests of the child" analysis. Citing *Vogel v. Vogel*, 262 Neb. 1030, 637 N.W.2d 611 (2002), the majority frames the issue as whether the custodial parent can "demonstrate that it is in the child's best interests *to continue living with him or her.*" (Emphasis supplied.) While this is an accurate statement of what we said in *Vogel* and other cases, I think it misstates the "best interests" issue under the facts of this case. Rebecca testified that if she is not granted permission to relocate to South Dakota, she and her new family would live in Nebraska with the child. At trial, Chadd only requested that the court deny Rebecca leave to relocate the child and did not ask the court to award custody to him. Thus, the child will continue to live with Rebecca whether or not Rebecca is given leave to relocate. The issue as presented to the district court was whether, on the basis of all relevant factors, it is in the best interests of the child to move to South Dakota *with Rebecca* or continue residing *with Rebecca* in Nebraska. The guardian ad litem correctly perceived this issue in arriving at his recommendation that the application for relocation be disallowed. The expert who testified on behalf of Rebecca seems to have missed the point when he opined that it would be in the best interests of the child "to move to South Dakota and maintain contact with her — primary contact with her custodial parent, her mother." This opinion ignores the fact that the child will have "primary contact" with Rebecca as the custodial parent regardless of whether she lives in Nebraska or South Dakota. The continuing integrity of the maternal bond is simply not an issue in this case.

As I read the record, there is credible evidence on each side of the issue. The move to South Dakota holds the promise of certain benefits to the child in that she would live in a larger house and stands to benefit in other ways from the economic opportunities anticipated by Clayton in his new employment. Also, if such opportunities are realized, Rebecca would be able to stay home with her children instead of working to supplement the family income, an arrangement which she and her expert witness believe will be beneficial to the child. It is also true that

the distance between Omaha and Huron, South Dakota, is not so great that it would absolutely preclude regular visitation; as the majority correctly notes, this distance is no greater than some intrastate relocations which would not require court approval.

On the other hand, the guardian ad litem for the child recommended that the court not allow the relocation because the potential benefits to the child did not outweigh the negative effect of separation from Chadd. Rebecca admitted that the move would make it virtually impossible for Chadd to participate in his daughter's school activities. She also admitted that under the biweekly visitation schedule she proposed in the event of relocation, her daughter would spend 9 hours every other weekend traveling by automobile between Rebecca's home in South Dakota and Chadd's home in Nebraska. The evidence also establishes that the child's extended family resides in Nebraska.

Based upon my de novo review of the record, I would conclude that in taking their respective positions in this case, each parent is sincerely motivated by what he or she genuinely believes to be in the best interests of their child. The proposed relocation would improve the child's quality of life in some respects as a result of the improved economic opportunities for Clayton and Rebecca's plan to stay home with her children, but the child's quality of life would be negatively impacted by the long biweekly commute for visitation and the diminished opportunity for interaction with her extended family. While the relocation would not completely eliminate the opportunity for regular visitation by Chadd, it would drastically alter the nature and frequency of the visitation he has exercised to date. Weighing these factors in order to determine whether to permit Rebecca to relocate with the child is a difficult task. Where, as in this case, there are no absolutes and no clearly right or clearly wrong answers, it is particularly important to bear in mind that our standard of review requires an appellate court to give deference to the discretion of the trial judge, who observed the demeanor of the witnesses as he or she heard their testimony. In order to reverse on the basis of an abuse of discretion, we must be able to state that the decision of the district court is untenable and unfairly deprives a litigant of a substantial right or a just result. I cannot reach that conclusion on this record. Finding no abuse of discretion, I would affirm.