IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
(Memorandum Web Opinion)

PALMER V. PALMER

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

ANGELIQUE N. PALMER, APPELLEE,

V.

BRIAN A. PALMER, APPELLANT.

Filed April 21, 2026.    No. A-25-339.

Appeal from the District Court for Douglas County: JAMES M. MASTELLER, Judge. Affirmed.

Brian A. Palmer, pro se.

John F. Eker III, for appellee.

RIEDMANN, Chief Judge, and PIRTLE and FREEMAN, Judges.

FREEMAN, Judge.

## I. INTRODUCTION

Brian A. Palmer appeals, and Angelique N. Palmer attempted to cross-appeal, from an order of the Douglas County District Court denying both parties' requests to relocate their child from Nebraska and modifying child support and medical expense obligations. Brian assigns error to the district court's application of the removal standard, calculation of child support, and denial of the income tax exemption. Following our review, we affirm the district court's judgment.

## II. BACKGROUND

### 1. DISSOLUTION

Brian and Angelique married in 2015, and the district court entered a decree of dissolution in September 2020. At the time of dissolution, Brian resided in Nebraska and Angelique resided in Texas. The court awarded the parties joint legal custody of their son Akira, born in 2015, and

- 1 -

awarded Brian primary physical custody. The court ordered Angelique to pay $216 per month in child support and neither party was required to provide health insurance. The parties were ordered to equally divide necessary reimbursed medical expenses and to alternate the dependency exemption, with Brian claiming Akira in even-numbered years and Angelique in odd-numbered years.

Because Angelique lived in Texas, the court did not award regular parenting time but granted holiday parenting time. Under the parenting plan, Angelique bore all travel expenses related to parenting time and was required to provide at least 30 days' advance notice.

## 2. COMPLAINT TO MODIFY

In November 2023, Brian filed a complaint to modify the decree, seeking to relocate Akira to Nevada based on a material change in circumstances. He alleged that new career opportunities would significantly improve his finances. Angelique filed a counterclaim seeking sole legal and physical custody of Akira, modification of the parenting plan, child support, and attorney fees. Brian filed an answer requesting a dismissal of Angelique's claims and sought modification of the parenting plan and child support.

## 3. TRIAL

Trial was held in July 2024. Both parties were represented by counsel.

### (a) Brian's Testimony

Brian testified regarding his employment history, support system in Nebraska, and proposed relocation. He worked as a career specialist from October 2022 to October 2023, earning approximately $54,000 annually. His October 2023 paystub reflected total year to date earnings of $45,306.62. His employer provided health insurance, including coverage for Akira. Brian relied primarily on his mother for support, with occasional help from one brother and Angelique's mother. He also had an aunt and two additional brothers in Nebraska.

Brian asserted that he paid for Akira's clothing, activities, gifts, and daily necessities. He supported Akira's participation in soccer, martial arts, and gymnastics and addressed behavioral issues with a school therapist.

Brian offered email correspondence reflecting a potential Nevada job opportunity as an independently contracted agency development manager. The email stated, in relevant part, "[p]er our conversation, Colonial Life Nevada would like to extend you an opportunity . . . This email will contain the link to the formal application for you to complete. If approved, you will become appointed with Colonial Life and receive your official agreement from our contracting team."

Based on this correspondence, Brian resigned from his job in Nebraska and relied on personal savings. He completed interviews, obtained a life insurance license paid for by the company, and submitted fingerprints. Although he lacked written confirmation of employment, he testified that the company sent him a follow-up email allowing relocation at any time. He testified that the position would increase financial stability and potentially double his prior income.

Brian testified that relocation would benefit Akira due to the climate, year-round outdoor activities, and proximity to Brian's sister and brother-in-law in Nevada. Brian planned to temporarily live with his sister who, despite her limited interactions with Akira, could assist Brian

beyond the capabilities of his mother. At the time of trial, Brian had not selected a school or arranged travel related to schooling. Brian also testified that relocation would alleviate his seasonal affective disorder and increase engagement with Akira. Brian further asserted that relocation would reduce Angelique's travel costs, estimating round-trip flights between Texas and Nevada at $132 compared to $366 between Nebraska and Texas.

Brian also testified regarding Angelique's parenting time and financial contributions. Brian described Angelique's relationship with Akira as inconsistent, with Akira sometimes refusing to speak to her. He asserted that Angelique failed to provide notice of visitation and did not contribute to extracurricular expenses or medical bills. He acknowledged that Angelique informed him in advance that she could not afford Akira's extracurricular activities. Brian also stated he submitted medical bills to Angelique, which she reported she could not pay.

Brian maintained that Angelique was delinquent in child support payments. He offered a Department of Health and Human Services (DHHS) payment history reflecting arrears. Based upon the failure to pay child support and the inability to support Akira's activities, Brian asserted that Angelique was financially incapable of caring for Akira. In further support of his complaint, Brian submitted a copy of an investment savings account in Akira's name, pictures of his home with Akira in Nebraska, his paystubs, and a copy of Angelique's tax returns.

(b) Angelique's Testimony

Angelique disputed portions of Brian's testimony. Angelique testified that she maintained regular contact with Akira via video calls, phone calls, and text messaging. She maintained that she exercised parenting time as permitted and typically travelled by rental car, driving 14 to 17 hours to avoid mileage on her personal vehicle. Angelique stayed with her mother when she visited Nebraska. She further testified that she never received receipts or requests for reimbursement of medical expenses and began providing health insurance for Akira in July 2023 at $426.41 per month. Angelique further explained that her child support delinquency resulted from a payroll withholding error, which she corrected once discovered.

Angelique also testified regarding her employment. She worked as a special education teaching assistant at a charter school, earning approximately $40,000 annually. Angelique testified that her current income was approximately the same as what she was making prior to August 2023. She testified that her income fluctuated due to hourly wages and a school year schedule with summers off. Angelique reported that her husband earned approximately $130,000 annually and they jointly contributed to household expenses. She acknowledged that she filed her tax return as single rather than married. She denied any financial instability.

Angelique expressed concerns regarding Brian's employment stability and prior attempts to relocate. Angelique expressed that Brian had changed jobs nearly every year, relying on his testimony recounting his employment from 2021, and had previously attempted to relocate Akira to both Arizona and Japan. Angelique offered a document containing messages between her and Brian discussing Akira, multiple tax returns and paystubs demonstrating her income, and a computation for child support in which she calculated a monthly income of $2,539. Her tax forms reported an earned income of $41,912 in 2022 and $39,033 in 2023.

Akira did not testify, despite the district court referencing either party's ability to call him.

## (c) District Court Requests

At the conclusion of trial, the district court noted that relocation determinations required the consideration of multiple factors under *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999). The court directed both parties to submit proposed orders applying the factors. The court also found that both parties established a material change in circumstances regarding child support and ordered them to submit updated child support calculations.

Brian submitted a brief in support of his proposed order in August 2024, which reiterated the contents of his trial testimony. The brief references that a child support calculation was attached; however, the child support calculation was not attached to the brief. However, the district court did attach his child support calculation to their final order. Angelique did not file a brief as requested by the district court.

## 4. POST-TRIAL MOTIONS

In September 2024, Brian filed an application for contempt and an order to show cause. Prior to a scheduled November 2024 hearing on the matter, the parties submitted a stipulated order providing that Angelique would pay $184.61 biweekly toward her current child support obligation and arrears, effective December 1, 2024. Neither party appeared at the November hearing, and the district court approved the stipulation in December. The stipulation did not have an attached child support calculation describing how the parties reached the determined amount.

## 5. DISTRICT COURT JUDGMENT

The district court entered its order in March 2025. The court found that both parents had a legitimate reason for removal, citing Brian's job opportunity in Nevada and Angelique's long-term relationship in Texas, but concluded that relocation was not in Akira's best interests. The court determined that neither parent acted to frustrate the other but maintained that Angelique's opposition to relocation was more compelling than Brian's request. The court further found that neither parent met their burden to prove that relocation would enhance Akira's quality of life. The court stated that relocation to either state would significantly and adversely affect both parents' ability to maintain a meaningful parent-child relationship. The court denied both removal requests.

Regarding child support, the district court ordered Angelique to pay $184.61 biweekly per the stipulated order filed in December 2024. For the health insurance and uncovered medical expenses, the court relied on Brian's child support calculation, which was attached to the district court's order as exhibit A. Brian's child support calculation also imputed a gross monthly income of $4,515 to Brian and $2,539 to Angelique. Brian was ordered to provide health insurance for Akira if reasonably available, and unreimbursed medical expenses over $250 per year were allocated 34 percent to Angelique and 66 percent to Brian.

The court ordered that Angelique continue to exercise all previously awarded parenting time in accordance with the dissolution decree, and that all other provisions of the dissolution decree remain in full force and effect. Each party was required to pay their own attorney fees.

Brian appeals, and Angelique attempted to cross-appeal.

## III. ASSIGNMENTS OF ERROR

On appeal, Brian assigns, restated, that the district court erred in (1) failing to apply *Farnsworth v. Farnsworth, supra*, and misapplying *Korth v. Korth*, 309 Neb. 115, 958 N.W.2d 683 (2021) in its removal analysis, (2) miscalculating child support, and (3) failing to modify the income tax exemption.

Although Angelique attempts to cross-appeal, the format and substance of her brief on cross-appeal fail to adhere to the briefing requirements found in Neb. Ct. R. App. P. § 2-109 (rev. 2025). Section 2-109(D)(4) requires that when an appellee presents a cross-appeal, it be clearly indicated on the cover and argued in a separate section of the brief. Angelique did not meet either of these prerequisites. Parties seeking appellate review of their claims for relief must abide by the appellate court's rules when presenting such claims. See *In re Interest of Natasha H. & Sierra H.*, 258 Neb. 131, 602 N.W.2d 439 (1999). Any party who fails to properly identify and present its claim does so at its peril. *Id.* The appellate courts of this state have always refused to consider a prayer for affirmative relief where such a claim is raised in a brief designated as that of an appellee. See *id.* As such, we decline to address Angelique's assignments of error on cross-appeal.

## IV. STANDARD OF REVIEW

Questions concerning relocation and custody are initially entrusted to the discretion of the trial court. *Korth v. Korth, supra*. Although reviewed de novo on the record, the trial court's answer to such questions will ordinarily be affirmed absent an abuse of discretion. *Id*. A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id*.

## V. ANALYSIS

### 1. FRAMEWORK FOR REMOVAL

The Nebraska Supreme Court has observed that custody cases involving parental relocation are among the most difficult and troubling for courts to decide. See *Korth v. Korth, supra*. This is so because of the competing and often legitimate interests of the parents in proposing or resisting the move, and because courts ultimately have the difficult task of weighing the best interests of the child at issue, "which may or may not be consistent with the personal interests of either or both parents." *Schrag v. Spear*, 290 Neb. 98, 105, 858 N.W.2d 865, 873 (2015) (quoting *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d at 597 (1999)). In these cases, courts are required to balance the noncustodial parent's desire to maintain their current involvement in the child's life with the custodial parent's chance to embark on a new or better life. *Id*.

In this case, Brian argues that the district court improperly relied on *Korth v. Korth, supra*, and *Weaver v. Weaver*, 308 Neb. 373, 954 N.W.2d 619 (2021), instead of *Farnsworth v. Farnsworth, supra*, in its removal analysis. He alternatively argues that the court misapplied the best interests standard by failing to give adequate weight to evidence favoring relocation.

In order to prevail on a motion to remove a minor child to another jurisdiction, the custodial parent must first satisfy the court that he or she has a legitimate reason for leaving the state. *State on behalf of Ryley G. v. Ryan G.*, 306 Neb. 63, 943 N.W.2d 709 (2020). The purpose of requiring a legitimate reason for leaving the state in a motion to remove a minor child to another jurisdiction

is to prevent the custodial parent from relocating the child because of an ulterior motive, such as frustrating the noncustodial parent's visitation rights. *Id*. After clearing that threshold, the custodial parent must next demonstrate that it is in the child's best interests to continue living with him or her. *Id*.

Brian's argument that the district court applied the wrong legal framework fails at the outset. Although Brian asserts that the court improperly relied on *Korth* and *Weaver* instead of *Farnsworth*, *Korth* merely recites the legal propositions of *Farnsworth*. The district court, in denying removal, reiterated all three of the *Farnsworth* considerations and the nine factors relevant to enhanced quality of life, as explicitly referenced in *Korth v. Korth*, 309 Neb. 115, 958 N.W.2d 683 (2021). The district court's order reflects the use of *Korth* as current case law, not a replacement of *Farnsworth*.

(a) Best Interests

Brian asserts that the district court improperly weighed evidence in favor of relocation to Nevada under the best interests' analysis. We find no merit to his assertion.

To determine whether removal to another jurisdiction is in the child's best interests, a trial court should consider (1) each parent's motive for seeking or opposing the move, (2) the potential that the move holds for enhancing the quality of life for the child and the custodial parent, and (3) the impact such a move will have on contact between the child and noncustodial parent when viewed in the light of reasonable visitation. *Korth v. Korth*, 309 Neb. 115, 958 N.W.2d 683 (2021). These three considerations are not exhaustive, nor will they be present in every case. *Id*. It is the moving party's burden to show, by a combination of these considerations, that removal would be in the child's best interests. *Id*.

The district court, in denying removal, recited all three of the *Farnsworth* considerations and the nine factors relevant to enhanced quality of life, as explicitly referenced in *Korth v. Korth, supra*. The district court made a general finding that the majority of the quality of life considerations did not support Akira's removal from Nebraska. In our de novo review, we will consider whether the district court abused its discretion in determining that Brian failed to demonstrate that removing Akira from Nebraska is in Akira's best interests.

*(i) Each Parent's Motive*

The first consideration is each parent's motive for seeking or opposing the move. See *McLaughlin v. McLaughlin,* 264 Neb. 232, 647 N.W.2d 577 (2002). The ultimate question for this consideration is whether either party has elected or resisted a removal in an effort to frustrate or manipulate the other party. See *id*.

In the district court, there was no evidence presented which would allow us to conclude that either party was seeking to frustrate the custodial rights of the opposing party, or otherwise acting in bad faith. On one hand, Brian desires to better his career, which the Nebraska Supreme Court has determined to be a legitimate and compelling motive. See *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d at 600 (1999). On the other hand, Angelique is concerned about the effect relocation would have on her relationship with Akira, given increased travel time and expenses. Thus, it appears that the motives of each party are equally balanced.

*(ii) Enhanced Quality of Life*

The second consideration under *Farnsworth* is whether removal to another jurisdiction would enhance the quality of life of the child and custodial parent. Under this prong, several factors may assist trial courts in assessing the enhanced quality of life for the child and the custodial parent. See *Farnsworth v. Farnsworth, supra*. These factors include: (1) the emotional, physical, and developmental needs of the child; (2) the child's opinion or preference as to where to live; (3) the extent to which the custodial parent's income or employment will be enhanced; (4) the degree to which housing or living conditions would be improved; (5) the existence of educational advantages; (6) the quality of the relationship between the child and each parent; (7) the strength of the child's ties to the present community and extended family there; (8) the likelihood that allowing or denying the move would antagonize hostilities between the two parents; and (9) the living conditions and employment opportunities for the custodial parent, because the best interests of the child are interwoven with the well-being of the custodial parent. See *id*.

This list should not be misconstrued as setting out a hierarchy of factors. *Id*. Depending on the circumstances of a particular case, any one factor or combination of factors may be variously weighted. *Id*. The district court did not provide a rationale for each factor in its order, but instead concluded that neither parent had met its burden of proof in establishing that removal would enhance Akira's quality of life or that of the custodial parent. Based on our de novo review, we agree.

## a. Emotional, Physical, and Developmental Needs

We first consider the impact on the child's emotional, physical, and developmental needs in assessing the extent to which the move could enhance Akira's life.

With respect to Akira's emotional, physical, and developmental needs, the record reflects they are currently being met in Nebraska. Having lived in the Nebraska community for all his life, Akira is acclimated and comfortable there. Akira participates in multiple extracurricular activities and receives school-based therapeutic support. Angelique is able to maintain regular contact and visitation provided that she has family that resides in Nebraska. Moreover, the majority of Brian's family lives nearby. In contrast, apart from his aunt and father, Akira would have no other biological family in Nevada.

Brian argued that moving to Nevada could provide greater financial support and year-round extracurricular activities and that the climate would allow him to participate more in Akira's activities. However, Akira already participates in activities in Nebraska, and Brian has managed his seasonal affective disorder for many years while living in Nebraska. Furthermore, Brian does not have a residence, or a school established for Akira. Relocation would also make it harder for Angelique to arrange travel and commit to parenting time.

Consequently, nothing in the record suggests that Nevada would provide superior developmental support beyond what Akira presently receives.

## b. Child's Opinion or Preference

Akira was not called to testify despite the court explicitly noting that he could be. To the extent that Brian argues that the court ignored relevant evidence pertaining to Akira's preferences, the district court cannot err by failing to consider something not in the record. See *Cain v. Custer*

*Cty. Bd. of Equal.*, 315 Neb. 809, 823, 1 N.W.3d 512, 524 (2024) ("[a] fact finder can rely only on evidence actually offered and admitted at trial and is not permitted to rely on matters not in evidence"). Because neither party presented Akira's testimony or evidence of Akira's preference at trial, the evidence was not in the record, and the district court cannot be faulted for not considering it. Consequently, this factor was not used to weigh in favor of or against removal.

### c. Enhancement of Custodial Parent's Income

It is true that moving to Nevada would likely enhance the income of Brian's household. The job in Nevada offered the opportunity for Brian to double his income. It was not necessary for Brian to prove that he could not find alternative work in Nebraska. See *Farnsworth v. Farnsworth, supra* ("we have never required custodial parent to exhaust all possible job leads locally before securing better position in another state."). This factor weighs in favor of removal to Nevada.

### d. Degree to Which Housing or Living Conditions Would Be Improved

Housing and living conditions do not support relocation. Brian planned to temporarily reside with his sister in Nevada, with no permanent housing arrangements in place. In Nebraska, Brian has an apartment that he shares with Akira. Consequently, moving to Nevada will force both Brian and Akira to give up their normal living situation in exchange for less privacy and stability.

### e. Existence of Educational Advantages

Another factor to consider is whether Nevada offers educational advantages. Brian did not present compelling evidence that the schools in Nevada were superior to Akira's school in Nebraska. Notably, Brian had not selected a school or arranged transportation at the time of trial. The lack of evidence to the contrary does little to support Brian's contentions.

### f. Quality of Relationship Between Child and Each Parent

Akira has a positive relationship with both parents. Brian has been Akira's primary caregiver since birth and retained primary custody after the 2020 dissolution. The record shows that Akira spends most of his time with Brian, with whom he maintains a consistent routine in Nebraska. Likewise, Angelique maintains a consistent relationship with Akira during holidays, summers, and scheduled breaks. She also communicates with Akira when she is not physically present in Nebraska. Relocating to Nevada would impose significant logistical challenges for visitation under her usual travel method, requiring longer travel times and coordination, which would reduce both the frequency and the quality of Akira's time with her. Consequently, this factor does not weigh in favor of relocation.

### g. Strength of Child's Ties to Present Community and Extended Family

The strength of Akira's ties to his present community and extended family also weighs against relocation. Akira has resided in Nebraska his entire life. He attends school there and participates in extracurricular activities. Brian testified that Akira is involved in soccer, gymnastics, and martial arts, all of which are rooted in the Nebraska community. Akira also has meaningful connections in Nebraska. Brian relies on his mother's support and has access to three brothers, an aunt, and Angelique's mother. This network provides familiarity for Akira. By

contrast, Brian acknowledged that Akira has had limited interactions with Brian's sister in Nevada, and he has no established community.

h. Likelihood That Allowing or Denying Move Would Antagonize Hostilities Between Parties

The record indicates that the parties have experienced some disagreements and some communication problems. Messages between the parties reflect difficulty in arranging parenting time due to transportation issues. This consideration does not weigh in favor of removal, as relocation already poses transportation issues.

As noted, the district court made a generalized finding that the quality of life considerations did not support removal. Similarly, we conclude that the quality of life considerations do not weigh in favor of allowing Akira to relocate to Nevada.

*(iii) Impact on Noncustodial Parent's Visitation*

The final consideration in the best interests' analysis is the impact such a move will have on contact between the child and the noncustodial parent. See *McLaughlin v. McLaughlin*, 264 Neb. 232, 647 N.W.2d 577 (2002). This effect must be viewed in light of the court's ability to devise a reasonable visitation arrangement that provides a satisfactory basis for preserving and fostering a child's relationship with the noncustodial parent. See *id*. The determination of reasonableness is to be made on a case-by-case basis. See *Vogel v. Vogel*, 262 Neb. 1030, 637 N.W.2d 611 (2002).

If Akira relocated to Nevada, his relationship with Angelique would be significantly impacted. The 2020 parenting plan established that Angelique bore responsibility for arranging and funding travel between Nebraska and Texas. She primarily drove and often rented a vehicle. Relocating to Nevada would substantially increase her travel time and costs due to the distance. Based on these circumstances, it was reasonable for the district court to conclude that any change in the current parenting plan would not adequately preserve Akira's relationship with Angelique following relocation.

Accordingly, the district court did not fail to apply the *Farnsworth* standard and did not abuse its discretion in determining that it was in the Akira's best interest to remain in Nebraska. Accordingly, Brian's assignment fails.

2. CHILD SUPPORT

Brian also assigns that the district court erred by imputing an inflated income to him while minimizing Angelique's verified earnings, resulting in an inequitable child support order. We find no merit to Brian's assignment.

The paramount concern when determining child support is the best interests of the child. See *Incontro v. Jacobs*, 277 Neb. 275, 761 N.W.2d 551 (2009). In general, child support payments should be set according to the Nebraska Child Support Guidelines. See Neb. Ct. R. § 4-203 (rev. 2025). The main principle behind the Guidelines is to recognize the equal duty of both parents to contribute to the support of their children in proportion to their respective net incomes. Neb Ct. R. § 4-201 (rev. 2025).

A party seeking to modify a child support order must show that a material change in circumstances (1) occurred subsequent to the entry of the original decree or previous modification

and (2) was not contemplated when the decree was entered. *Kingston v. Kingston*, 320 Neb. 981, 32 N.W.3d 221 (2026).

The record reflects that the child support obligation was the product of an agreement voluntarily entered into by the parties. Stipulations voluntarily entered into between the parties to a cause or their attorneys, for the government of their conduct and the control of their rights during the trial or progress of the cause, will be respected and enforced by the courts, where such stipulations are not contrary to good morals or sound public policy. *Walters v. Walters*, 12 Neb. App. 340, 673 N.W.2d 585 (2004). Courts will enforce valid stipulations unless some good cause is shown for declining to do so, especially where the stipulations have been acted upon so that the parties could not be placed in status quo. *Id*. However, disposition of a question pertaining to a child's best interests is not governed exclusively by a parental stipulation. See *id.*

The Nebraska Child Support Guidelines provides that all stipulated agreements for child support must be reviewed against the guidelines and if a deviation exists and is approved by the court, specific findings giving the reason for the deviation must be made. See Neb. Ct. R. § 4-203 (rev. 2025). The Nebraska Supreme Court has held that child support payments are a vested right of the payee in a dissolution action as they accrue and that such payments may be changed only by modification of the decree based on a material change in circumstances. See *Lizeth E. v. Roberto E.*, 317 Neb. 971, 12 N.W.3d 809 (2024). Accordingly, a court may not forgive or modify past-due child support, but may modify the amount of child support becoming due in the future. See *id*.

Here, the district court incorporated the amount from the stipulated order entered in December 2024 following contempt proceedings. The stipulation provided that Angelique would continue to pay her current monthly obligation with an additional amount paid toward the arrears amounting to $184.61 every two weeks.

Contrary to Brian's argument, the record demonstrates that the income figures utilized by the district court did not constitute an abuse of discretion. While this record does not contain a child support calculation for the stipulated amount, the court did adopt Brian's child support calculation for the purposes of determining health insurance and medical reimbursement. In that calculation attached to the district court's order, Brian adopted $2,539 as Angelique's monthly income. The district court accepted that calculation in determining each parent's percent of medical obligation. Having adopted those figures, Brian cannot now challenge the income determinations that he previously supplied. A party cannot complain of error which the party has invited the court to commit. *White v. White*, 320 Neb. 256, 26 N.W.3d 924 (2025).

The same is true of Brian's own income. The monthly income of $4,515, which he now characterizes as inflated, was included in his calculation and is consistent with his own testimony that he earned approximately $54,000 annually and his paystub exhibiting year to date earnings in October 2023 of $45,306.62. Brian also conceded that he had a higher earning potential supported by prospective job opportunities. Thus, the district court's use of a figure supplied by Brian and consistent with his admitted salary was well within its discretion.

Furthermore, Brian's attached child support calculation totals Angelique's final share at $287, which when divided into biweekly payments, equals $143.50. When compared to the stipulated biweekly payments of $184.61, the $41.11 difference represents an additional amount applied toward her arrearage. Thus, the figures that Brian challenges are not the result of inflated income figures, but rather a payment obligation that is plainly supported by his own calculation

- 10 -

and testimony. Accordingly, the district court's reliance on the stipulated amount in its final order does not constitute an abuse of discretion. This assignment fails.

### 3. TAX EXEMPTION

Brian assigns that the district court erred by declining to modify the alternating tax exemption provision in accordance with federal law and the party's actual custodial arrangement. Brian argues that because he has been the custodial parent since 2020 and no valid waiver was executed, federal law requires the court to align the tax exemption with actual custody. We decline to address this assigned error.

This is the first time that Brian raised the dependent tax exemption argument. While Brian claims that the issue was raised through uncontroverted trial testimony establishing that Brian maintained primary custody, the argument was not explicitly raised to the district court. Appellate courts will not consider issues on appeal that were not presented to or passed upon by the trial court. *In re Interest of Paxton H.*, 300 Neb. 446, 915 N.W.2d 45 (2018). Accordingly, we do not address this assignment of error further.

### VI. CONCLUSION

We conclude the district court did not abuse its discretion in determining that it was in Akira's best interests to remain living with Brian in Nebraska. We further conclude that the district court did not err in determining child support or allocation of unreimbursed medical expenses.

AFFIRMED.