IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

STATE ON BEHALF OF ANDREASEN V. ANDREASEN

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE ON BEHALF OF HONORA ANDREASEN, A MINOR CHILD, APPELLEE,

V.

MICHAEL R. ANDREASEN, DEFENDANT AND THIRD-PARTY PLAINTIFF, APPELLEE,
AND AHKESHIA K. HENLEY, THIRD-PARTY DEFENDANT, APPELLANT.

Filed August 18, 2020.    No. A-19-929.

Appeal from the District Court for Dodge County: GEOFFREY C. HALL, Judge. Affirmed.

Avis R. Andrews for appellant.

Linsey Moran Bryant and Shane J. Placek, of Sidner Law, for appellee Michael R. Andreasen.

PIRTLE, BISHOP, and ARTERBURN, Judges.

BISHOP, Judge.

## I. INTRODUCTION

In 2013, Michael R. Andreasen and Ahkeshia K. Henley entered into a stipulated custody order which awarded them joint legal custody of their minor child, Honora Andreasen, with physical custody awarded to Ahkeshia. In 2016, Michael filed a complaint to modify in the Dodge County District Court, seeking full custody of Honora as a result of receiving certified notice that Ahkeshia intended to remove Honora from Nebraska to Idaho without a court order or hearing. Ahkeshia filed a "Counter-Complaint" seeking full custody and permission to remove Honora from Nebraska to Idaho. After a trial, the district court denied Ahkeshia's removal request and awarded Michael sole physical custody. On appeal, Ahkeshia challenges the district court's denial

- 1 -

of her request for removal, its calculation of child support, and its failure to award her attorney fees and costs. We affirm.

## II. BACKGROUND

### 1. Prior Circumstances

The parties lived together for a period of time after Honora's birth in 2008. They separated in June 2010; the record does not reflect that they were ever married. In 2013, the district court entered a stipulated order awarding the parties joint legal custody of Honora, with primary physical custody awarded to Ahkeshia. Other details of that order and its corresponding parenting plan were discussed in *State on behalf of Andreasen v. Andreasen,* No. A-17-1195, 2019 WL 668519 (Neb. App. Feb. 19, 2019) (selected for posting to court website).

### 2. Circumstances Upon Ahkeshia's Request to Remove Honora to Idaho

#### (a) Parties' Filings and District Court's Temporary Order

On March 1, 2016, Michael filed a complaint to modify, alleging there had been a substantial and material change in circumstances, namely, that Ahkeshia provided certified notice around February 27 of her intent to remove Honora from Nebraska without a court order or hearing. He argued it was in Honora's best interests to remain in Nebraska and that he be granted full temporary and permanent custody of her, and that child support be modified. The State filed an answer on Honora's behalf to generally deny Michael's material allegations. After a hearing, the district court issued an order on March 23 awarding Michael temporary full custody of Honora, subject to Ahkeshia's temporary parenting time (every other weekend at the maternal grandmother's residence, and reasonable, liberal telephonic communication). The district court denied Honora's removal from Nebraska without its permission and suspended Michael's child support obligation as of March 31.

On April 5, 2016, Ahkeshia filed an "Answer and Counter-Complaint," denying Michael's material allegations. She sought full custody, revision of the parenting plan, leave to remove Honora to Idaho, and determination of each party's obligation for Honora's financial support. She alleged a modification of the stipulated order was warranted due to various reasons. She claimed that to obtain the temporary order Michael mischaracterized her move and their discussions and that her life changes necessitated her move.

#### (b) Trial

Trial took place on February 22, 2017. Evidence consisted of exhibits and testimony from each party as well as the testimony of Ahkeshia's mother, Joan Vignery, and Ahkeshia's fiance, Luis Velazquez.

Ahkeshia and Luis were longtime members of the U.S. Army Reserve. Luis was stationed in Fremont, Nebraska, from about the summer of 2010 until August 2014. During that time, Luis and Ahkeshia dated and they had their first child together (Honora's half-sister). Ahkeshia said she and Luis lived together from August 2011 to August 2013, and then separated. Ahkeshia then lived with her parents at their home in Fremont. Ahkeshia said she and Luis tried resolving their

"differences" and "got back together" in November 2015. After Luis left Fremont, he was stationed in New Mexico and then became stationed in Idaho in March 2016. Ahkeshia, Luis, and Honora's half-sister moved to Idaho on March 15. Ahkeshia and Luis had another child (Honora's half-brother) in January 2017. Ahkeshia and Luis became engaged on February 14.

Michael owned a home in Kennard, Nebraska, where he had lived for about 10 years. In March 2016, Michael started his own limited liability company. He installed "low voltage electronics and security systems" and "whole house audio." He worked Monday to Friday, 8 a.m. to 5 p.m.; he made his own schedule. Michael traveled to different Nebraska cities and was "on call wherever people need[ed] service." Michael also worked as a subcontractor for a different company. Regarding the time since Ahkeshia moved, Michael usually dropped Honora off at school before work and then picked her up at about 5 p.m. to 5:15 p.m. after work. Honora's school had a free afterschool program until 5:45 p.m. After picking up Honora, she and Michael usually went to the grocery store and then went home and were finished with dinner by 8:30 p.m. Michael encouraged Honora to call Ahkeshia after dinner and tried to have Honora in bed by 9 p.m.

Since March 2016, Michael had gone to "parent/teacher conferences," "PTA meetings," "Daddy/Daughter dances," and other activities with Honora such as "Family Fun Night." (Ahkeshia admittedly had not stayed in touch with Honora's school since moving to Idaho.) Michael said he had attended "parent/teacher conferences" prior to entry of the temporary order as well. Michael indicated Honora had been enrolled in swimming, but at the time of trial she was not signed up for any activities. Michael took Honora to the zoo, the pumpkin patch, and the park, and they kayaked during the summer. Michael occasionally allowed Honora to spend weekends with Ahkeshia's parents; Joan said Michael would let her have Honora for a weekend or up to at least 4 days, "[p]robably about twice a month." Michael and Honora frequently spent time with other extended family in Nebraska, too.

Ahkeshia worked an evening shift as an area supervisor at a clothing retail store in Idaho and expected to continue working that shift for at least 2 months. After that, she expected to work during the daytime. The extent of Ahkeshia's Army service was one weekend per month plus 2 weeks every year; Luis attended the same sessions. Ahkeshia said there were a couple months out of the year where she "may" serve 3 or 4 days per month but usually it was 2 days per month. The monthly training typically took place in Twin Falls, Idaho. Ahkeshia received advanced notice of the date and location for the yearly 2-week training; in 2017, it was to occur in August in Virginia. Ahkeshia indicated the wife of another service member in their unit watched their children during the time that she and Luis were away from home for their 2-week training. Luis and Ahkeshia acknowledged that they could be deployed at any time.

Luis was a main supervisor of over 100 soldiers. He expected the position to last for 3 to 5 years (he had already held the position for almost 1 year by trial). Luis anticipated retiring in about 5 years. It was "possible" he might reach retirement before he would have to move again. His seniority did not provide him any control over the time he would have to move, but he could refuse to move one time. Luis had two other teenage children from a prior marriage who lived in Texas. Luis denied that he anticipated moving close to those children upon retirement. Luis' normal work hours were Monday through Friday, 8:30 a.m. to about 4:30 p.m. Concerning Ahkeshia's night shift at the store, Luis said he worked in a building with only four coworkers and could bring his

children to work with him during times he and Ahkeshia both worked. He could also work from home sometimes. Luis and Ahkeshia did not use childcare for their children; Ahkeshia said they would do so once her store shift changed.

Luis and Joan described Ahkeshia as a "great" or "wonderful" mother. Luis and Ahkeshia indicated they equally shared parenting responsibilities. If Honora moved to Idaho, Ahkeshia intended to enroll her in a "Girl Scouts" troop (Honora had never been involved in that before). Ahkeshia said Honora enjoyed hiking and visiting a lake when she visited Idaho in the summer of 2016; Michael agreed that Honora liked outdoor activities. Idaho also had a "YMCA" for indoor activities and the family could visit Boise, Idaho, on the weekends. Ahkeshia made sure to "take care of [her] children very well," paid attention to their schooling, and made sure they "mind[ed] [their] manners." She believed in discipline but not in a "harsh" way; she indicated she also believed in homemade meals and schedules. Michael and Luis had met during exchanges before; Michael did not have any complaints regarding Luis' care of Honora, and Luis supported Michael as Honora's father.

Other trial evidence is discussed below, as relevant to the issues on appeal. At the end of trial, the district court took the matter under advisement.

(c) District Court's Modification Order, Ahkeshia's
Motion for New Trial, and First Appeal

The district court entered an "Order of Modification" on August 3, 2017. It denied Ahkeshia's request for removal and sustained Michael's request for sole physical custody of Honora; the parties retained joint legal custody. Ahkeshia was ordered to pay $330 per month in child support. The district court set forth specific parenting time provisions in the order, namely that Ahkeshia would have parenting time with Honora in the summer from June 1 until July 31 each year, plus the following holiday periods every year: from noon on "Christmas Day" until the day before the end of "Christmas break," the "entire Spring Break," and "over the July Fourth holiday." The parties were given "Thanksgiving break" on an alternating basis, and Michael was given the following holidays every year: Easter, Memorial Day, and Labor Day. Ahkeshia was to have liberal and regular "telephone/Facetime/Skype" parenting time, and all transportation costs "to effectuate the visitation schedule as ordered" were to be equally shared by the parties. Each party would be responsible for their own attorney fees and costs related to the action. Michael's counsel was ordered to prepare an "Amended Parenting Plan" to be approved by each party's counsel as to form and content, and it was then to be submitted to the district court for its signature upon completion.

After Ahkeshia's August 10, 2017, "Motion for New Trial or Reconsideration" was overruled in October, she appealed, claiming that the district court erred when it (1) denied her removal request, (2) did not adopt an appropriate amended parenting plan, and (3) did not properly calculate child support. We dismissed that appeal for lack of jurisdiction because the amended parenting plan referenced in the modification order was not actually included or incorporated into that order. See *State on behalf of Andreasen v. Andreasen, supra*.

### (d) Further Proceedings in District Court and Second Appeal

On March 1, 2019, Ahkeshia filed a motion for an order compelling Michael's counsel to prepare and submit for review a parenting plan as previously ordered. She also asked that Michael be ordered to pay her attorney fees and costs incurred in relation to the appeal and further proceedings. During an evidentiary hearing on March 25, the same day this court's mandate of the first appeal issued, the district court orally ordered Michael's counsel to prepare a parenting plan and then send it to Ahkeshia's counsel; a signed parenting plan was to be submitted to the court by April 8. On March 28, the district court entered a judgment spreading the mandate of this court and ordering Ahkeshia to pay the costs of the first appeal.

On April 8, 2019, Michael's counsel filed a parenting plan, which was approved as to form and content by Ahkeshia's counsel. The parenting plan conformed to the modification order. However, it lacked a case caption or judge approval. On May 7, Ahkeshia filed an appeal, evidently from the April 8 parenting plan. During an evidentiary hearing on July 29, the district court said it would not award any attorney fees and it directed Ahkeshia's counsel to prepare and file a modified order with a parenting plan attached to it. Thereafter, on September 27, this court granted Michael's motion for summary dismissal of Ahkeshia's second appeal for lack of jurisdiction because the parenting plan was not a final order.

### (e) District Court's Approval and Incorporation of Parenting Plan Into Prior Modification Order and Ahkeshia's Instant Appeal

On August 22, 2019, the district court entered an order stating: "A Parenting Plan having been prepared and submitted herein pursuant to the Court's prior orders, said Parenting Plan is approved by the court and considered as part of the Order of Modification entered herein on August 3, 2017, and fully incorporated therein by reference." We note that although the order is file-stamped August 22, 2019, the transcript index reflects a date of August 23 and the parties refer to August 23 in their briefs. Because the clerk of the court's file-stamp is dated August 22, 2019, we will refer to that date as the date of the final order. See Neb. Rev. Stat. § 25-1301(3) (Cum. Supp. 2018) (entry of judgment, decree, or final order occurs when clerk of court places file stamp and date upon judgment, decree, or final order; for purposes of determining time for appeal, date stamped on judgment, decree, or final order shall be date of entry).

Ahkeshia now appeals from the August 22, 2019, order.

## III. ASSIGNMENTS OF ERROR

Ahkeshia claims, consolidated and restated, that the district court erred when it (1) denied her request to remove Honora from Nebraska to Idaho, (2) did not properly calculate child support, and (3) did not award her attorney fees and costs.

## IV. STANDARD OF REVIEW

Child custody determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015). In child custody cases, where the credible evidence is in conflict on a material issue of fact, the

appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Id.*

Modification of child support is entrusted to the discretion of the trial court. *Hotz v. Hotz*, 301 Neb. 102, 917 N.W.2d 467 (2018). An appellate court reviews proceedings for modification of child support de novo on the record and will affirm the judgment of the trial court absent an abuse of discretion. *Id.*

When an attorney fee is authorized, the amount of the fee is addressed to the trial court's discretion, and its ruling will not be disturbed on appeal absent an abuse of discretion. *Gonzalez v. Union Pacific RR. Co.*, 282 Neb. 47, 803 N.W.2d 424 (2011).

An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Schrag v. Spear, supra.*

## V. ANALYSIS

### 1. REMOVAL

Ahkeshia argues that but for her move to Idaho, "there would be no basis for a change in physical custody." Brief for appellant at 27. She claims that she should have been granted leave to remove Honora from Nebraska to Idaho. Before a custodial parent can remove a child from the state, permission of the court is required, whether or not there is a travel restriction placed on the custodial parent. *Schrag v. Spear, supra.* In order to prevail on a motion to remove a minor child to another jurisdiction, the custodial parent must first satisfy the court that he or she has a legitimate reason for leaving the state. *Id.* After clearing that threshold, the custodial parent must also demonstrate that it is in the child's best interests to continue living with him or her in the new location. *Id.* The paramount consideration is whether the proposed move is in the best interests of the child. *Id.* We proceed to consider Ahkeshia's claim under that framework.

### (a) Legitimate Reason to Leave State

Ahkeshia's reasons for moving to Idaho were that Luis was stationed there, she had a child with Luis and wanted them to stay together as a family unit, and she had financial commitments. The district court found that Ahkeshia had a legitimate reason for requesting removal of Honora to Idaho. Michael indicates some disagreement with that decision in his appellate brief, but he did not cross-appeal any aspect of the district court's decision. Regardless, the record supports the district court's determination that Ahkeshia's reasons for moving constituted a legitimate reason for removal.

### (b) Child's Best Interests

In determining whether removal to another jurisdiction is in the child's best interests, the trial court considers (1) each parent's motives for seeking or opposing the move; (2) the potential that the move holds for enhancing the quality of life for the child and the custodial parent; and (3) the impact such a move will have on contact between the child and the noncustodial parent, when viewed in the light of reasonable visitation. *McLaughlin v. McLaughlin*, 264 Neb. 232, 647 N.W.2d 577 (2002). See, also, *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999).

*(i) Each Parent's Motives*

The ultimate question in evaluating the parties' motives is whether either party has elected or resisted a removal in an effort to frustrate or manipulate the other party. *McLaughlin v. McLaughlin, supra*. The district court found no evidence of this, and found the parties' motives to be equally balanced. Despite some complaints by Ahkeshia about how Michael responded to her request for removal, the record does not show his opposition was improper or ill motivated. The record supports that Michael simply wanted Honora to remain in Nebraska because of the relationship he shared with her. He testified that "it hurts just thinking about not seeing [Honora] every day." Ahkeshia's removal request was not done to frustrate or manipulate Michael either. She had a legitimate reason for her request. We agree with the district court that the parties' motives were equally balanced.

*(ii) Quality of Life*

The Nebraska Supreme Court has set forth a number of factors to assist trial courts in assessing whether the proposed move will enhance the quality of life for the child and the custodial parent. See *Farnsworth v. Farnsworth, supra*. Factors to be considered include: (1) the emotional, physical, and developmental needs of the child; (2) the child's opinion or preference as to where to live; (3) the extent to which the custodial parent's income or employment will be enhanced; (4) the degree to which housing or living conditions would be improved; (5) the existence of educational advantages; (6) the quality of the relationship between the child and each parent; (7) the strength of the child's ties to the present community and extended family there; (8) the likelihood that allowing or denying the move would antagonize hostilities between the two parents; and (9) the living conditions and employment opportunities for the custodial parent because the best interests of the child are interwoven with the well-being of the custodial parent. *Kashyap v. Kashyap,* 26 Neb. App. 511, 921 N.W.2d 835 (2018). This list should not be misconstrued as setting out a hierarchy of factors. *Id.* Depending on the circumstances of a particular case, any one factor or combination of factors may be variously weighted. *Id.* Ahkeshia argues that the district court failed to properly weigh several of those factors.

a. Emotional, Physical, and Developmental Needs of Honora

The district court found both parents to have a "strong bond" with Honora, and that both parents "are decent people and seem to be a positive influence" on Honora. Important to the district court was the fact that Honora had "spent her entire life in Nebraska and has family and friends here," and has been enrolled in the Fremont schools since she started school. Honora "has emotional and familial ties to this state." The district court found this factor weighed against removal.

Although Ahkeshia and Joan testified about some concerns related to Honora maintaining proper hygiene under Michael's care, the district court did not attribute much weight to the hygiene complaints because it found that Michael provided a "solid and stable" home and appeared to provide "well" for Honora. The record supports that Honora's emotional, physical, and developmental needs could be met either by Michael in Nebraska or by Ahkeshia in Idaho. Although the district court found this factor weighed against removal, its findings relate more

closely to factor "g." below. We conclude this factor is neutral given both parents' ability to provide proper care for Honora.

### b. Honora's Opinion or Preference

This factor is not applicable here because Honora did not testify at trial.

### c. Enhancement of Income or Employment

The district court concluded that although Ahkeshia and Luis had good employment opportunities in Idaho, the evidence did not indicate that "any advancement, enhancement, or significant additional employment opportunities" were not available in Nebraska. It therefore found this factor weighed against removal.

Before Ahkeshia's move, she was an administrative assistant for a company in Valley, Nebraska. She worked 8 a.m. to 5 p.m. (work days not specified) and earned $18 per hour. She agreed that she earned between $5,000 and $6,000 a year from the Army. Her 2015 tax returns reflect an income of about $47,000; her 2014 tax returns show about $38,000. She said the income for those years came from her administrative assistant job and the Army. Besides her continued Army employment, Ahkeshia did not have a job when she moved to Idaho or for a period of time thereafter. She said she had interviewed for a job but was not hired. Ahkeshia and Luis decided she would be a "stay-at-home mom" for a while. Ahkeshia said Luis was able to support her and their children. By trial, Ahkeshia was an area supervisor at a clothing retail store in Idaho. She made $11.50 per hour. Her "training hours" were 3 p.m. to 11 p.m. (days worked varied, sometimes she had weekdays off and sometimes she worked on weekends); she anticipated having that shift for at least 2 more months. After that, her shift would be "whatever, to cover the management schedule" but she expected her hours to be 8 a.m. to 3 p.m.

Ahkeshia argues that for her to be with Luis and their children, "Nebraska was not an option" because Luis was "stationed where he was stationed." Brief for appellant at 31. Although it appears Ahkeshia could have continued her Army training while maintaining a Nebraska residence, the record supports that Luis had to move to Idaho to continue his Army service. A custodial parent's income can be enhanced because of a new spouse's career opportunities. See *McLaughlin v. McLaughlin, supra*. Ahkeshia and Luis were not engaged to each other at the time of their move, and even though they already had a child together they had lived separately for some time before that. Nevertheless, the record supports that they intended to live as a family unit at the time of the Idaho move. Since Ahkeshia did not enhance her own income or employment by moving to Idaho, the record supports the district court's conclusion that this factor weighed against removal.

### d. Housing or Living Conditions

The district court found the quality of housing and living conditions for Ahkeshia and Honora "would be essentially the same whether in Idaho or Nebraska," thus finding "[t]his factor weighs equally between the parties."

Michael lived in a two-story house which had a parlor, living room, kitchen, bathroom, and three bedrooms. Honora had her own room. Michael said a large garage located next to his home

was used as his shop for his company. His neighborhood was "very peaceful." There were children who were Honora's age in the neighborhood. There was a city park a "block away" from Michael's house. Honora enjoyed playing with Michael's two dogs. In the past, Michael was in a relationship with a woman who occasionally stayed with him overnight at times when Honora was there. By trial, Michael was not in a relationship with anyone.

Ahkeshia had testified that Michael's home was "fairly cluttered" at the time she had seen it. She said a hallway was obstructed by boxes. Ahkeshia indicated she had seen Michael's house while talking with Honora over "Facetime." However, the last time Ahkeshia had been to his house was about a year before trial. Michael said Ahkeshia had never "physically [sic]" expressed concern about the cleanliness of his house to him. The record does not show that Michael's home was unsuitable for raising a child.

Prior to her move to Idaho, Ahkeshia lived with her parents at their home in Fremont. Ahkeshia and Luis moved into a home in Twin Falls in March 2016. The church they attended was about 1½ miles away from that home. Michael attended church with Honora in Nebraska, too. When Honora visited Idaho in the summer of 2016, she shared a bedroom with her half-sister. Luis' other two children visited him in the summer and some holidays. There were times when all five children would be living with Ahkeshia and Luis.

By trial, Ahkeshia and Luis had signed a 1-year lease for a different home in Twin Falls that they were going to move into on March 1, 2017. Ahkeshia said it was "much larger" than their first Idaho home. The new home would have four bedrooms. Ahkeshia said Honora could play with other service members' children and would make friends in school in Idaho. Ahkeshia and Luis testified about how Honora had positive relationships with her half-siblings. Ahkeshia felt it was important for Honora and her half-siblings to grow up together. Luis said Honora also got along well with his other children. Luis felt the new neighborhood was "very good." Ahkeshia said a park would be about 20 feet away from their backyard. Luis believed Twin Falls was a good location for the family.

The quality of Ahkeshia's housing and living conditions improved from her move as she was able to live with Luis and their children. However, a comparison of the quality of Honora's housing and living conditions in Nebraska versus Idaho does not show much of a distinction, all things considered. In previous cases, where the evidence does not establish any significant improvement in housing or living conditions, we have determined that the factor does not weigh in favor of or against removal. See, *Hiller v. Hiller*, 23 Neb. App. 768, 876 N.W.2d 685 (2016); *Dragon v. Dragon*, 21 Neb. App. 228, 838 N.W.2d 56 (2013). For the same reason, we agree with the district court that this factor does not weigh for or against removal here.

e. Educational Advantages

The district court found the educational opportunities for Honora were essentially the same between Idaho and Nebraska, and thus this factor weighed equally between the parties.

Honora had attended Grant Elementary, a public school in Fremont, for almost 3 years. Honora's second grade report card showed she received good grades and only had two absences for the year so far. Grant Elementary had been on a continuous education calendar. Michael had opted to keep Honora there after Ahkeshia's move because he thought Honora did not "lose the

education over the summer." The school was switching to a "standard school year" at the end of 2017. Michael's home was located in the Arlington or Blair school district. He was considering transferring Honora to a school in Arlington; Honora had toured it and "seemed to like it a lot." But Michael was also considering keeping Honora at Grant Elementary. Ahkeshia did not have any concerns with Honora's school at the time of trial. Ahkeshia found that the schools in Idaho were on what Michael had described as the "standard school year" schedule. The Idaho schools had test scores that were "average to fairly -- to above average." Ahkeshia compiled a packet regarding things available for Honora in Idaho, including schooling; it included a handwritten note that they were considering enrolling Honora in a public school or a Christian school where they attended church. It contained some statistics about Idaho schools and a school calendar for a certain Twin Falls school district.

Ahkeshia contends that the evidence showed that regardless of the district court's decision, Honora "would be changing schools." Brief for appellant at 32. However, the record suggests there was still a chance that Honora would remain at Grant Elementary if she remained in Nebraska. The educational advantages factor receives little or no weight when the custodial parent fails to prove that new schools are superior. See *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999). While Ahkeshia provided some documents and testimony about schools in Idaho, she failed to offer any evidence to show that education in Idaho would be somehow superior to Honora's schooling in Nebraska. See *id.* Rather, she thought Honora would "excel" in school in Idaho "just as much as she does here [in Nebraska]." Ahkeshia also argues that Honora would benefit educationally from moving as she would be "part of a family that includes her siblings." Brief for appellant at 32. But Honora has plenty of family in Nebraska to learn from as well. We agree with the district court that this factor is neutral.

### f. Relationship Between Honora and Each Parent

The district court found Honora to be "well bonded to both her parents." However, it was concerned that "the significant distance from Nebraska to Idaho" would "greatly impact the relationship between [Honora] and the parent left behind." The court noted that electronic visitation would lessen the distance impact to a limited extent, and that extended summer parenting time would help as well. The court found that "when all factors are considered, it is apparent to this Court that the removal of the child to Idaho would create a significant barrier to the quality of the relationship between the minor child and the Father." The court concluded that "[t]he diminished contact between the Father and child weighs against removal" from Nebraska. However, the same can be said for the impact on Ahkeshia's relationship with Honora if Honora remains in Nebraska. As noted by Ahkeshia, the district court focused more on the issue of the impact of a move on contact between Honora and Michael (addressed below under item "*(iii)*") rather than on the quality of the relationship between Honora and each parent. We agree, and because Honora had a quality relationship with both parents, we find this factor to be neutral.

### g. Honora's Ties to Present Community and Extended Family

The district court found this factor weighed against removal and we agree. The record suggests that Honora had generally been around the same classmates during her time at Grant

Elementary. She played with other children in Michael's neighborhood. Several of Michael's extended family members lived in or near Kennard, including his parents, two of his aunts and one uncle, his grandmother, his cousin and her husband and their son, his sister and her husband and their four kids, and his brother. Since 2013, those family members would try to get together at least once a week for dinner. They spent holidays together. Michael saw his sister "quite a bit" during the week. It also "seemed like every other weekend" the family got together. Ahkeshia's mother and father as well as two of her sisters lived in Fremont.

Joan had regularly spent time with Honora throughout her life. Even though Joan loved Honora, Joan supported Ahkeshia's request to remove Honora to Idaho. Joan said she and her husband planned to visit Idaho in August 2017, and she wanted to make regular trips there once or twice a year. Ahkeshia admitted that her family from Nebraska had not visited her in Idaho yet (it had been about 1 year). Nevertheless, Joan agreed that she could get along with Michael and continue to have time with Honora regardless of the court's decision and that she could put aside any personal differences and do what was best for Honora.

In Idaho, Honora would be surrounded by family as well (Ahkeshia, Luis, her two half-siblings, and sometimes Luis' other children). Honora could make new friends and classmates in Idaho. However, the evidence reflects that Honora had existing strong ties to both the paternal and maternal sides of her family in Nebraska. This factor therefore weighs against removal.

h. Hostilities Between Parents

The district court found this factor to be equally balanced, noting that the evidence did "not indicate that there is a great deal of hostility or antagonistic feelings between the parents." The court noted that the level and quality of communication between the parents could be better, but that "a structured and consistent visitation and communication schedule will keep the relationship between the parents intact while not in any way increasing the hostility between the parties."

However, Ahkeshia believes the evidence showed that "while the parties tried to be civil, it was clearly [Michael] who was more aggressive and non-communicative when it came to dealing with [her] desire to move [Honora]." Brief for appellant at 34. She asserted that he did not appear to be "overly amenable" to working with her to maintain her relationship with Honora. *Id.* Though the parties had some difficulties communicating regarding Ahkeshia's removal request, they were agreeable to sharing legal custody of Honora as they had done in the past and they had a history of being able to communicate with one another about Honora. During trial, Michael agreed he would try his best to comply and allow Ahkeshia to see Honora. The parties had been able to agree on physical parenting time for Ahkeshia other than what was stated in the temporary order. Michael had facilitated Ahkeshia being able to maintain regular contact with Honora via technology. As the district court stated at the end of trial, Ahkeshia and Michael both care about and love Honora. They were able to put aside their personal differences and put Honora "first." The record does not support that allowing or denying removal would antagonize the hostilities between Ahkeshia and Michael. We agree with the district court that this factor is neutral.

### i. Child's Best Interests Are Interwoven With
### Well-Being of Custodial Parent

This factor was not addressed by the district court. This final quality of life factor listed in *Farnsworth v. Farnsworth*, 257 Neb. 242, 251, 597 N.W.2d 592, 599 (1999), considers "the living conditions and employment opportunities for the custodial parent because the best interests of the children are interwoven with the well-being of the custodial parent." Since a comparison of the physical residences and the custodial parent's employment or income enhancements is considered under separate factors, we view this factor to focus more on how the proposed new living conditions and employment will impact the well-being of the custodial parent and how that might impact the child. See *Hiller v. Hiller*, 23 Neb. App. 768, 876 N.W.2d 685 (2016). Clearly, Ahkeshia's well-being would be best served by being able to live in the same household with all her children and Luis, so this factor would favor removal insofar as Ahkeshia's happier state of mind would favorably impact Honora.

### j. Summary of Quality of Life Factors

The district court found four quality of life factors weighed against removal: Honora's emotional, physical, and developmental needs; enhancement of income or employment; Honora's relationship with her parents; and Honora's ties to her present community and extended family. It found the remaining factors to be neutral. We found the record supported the district court's determinations for the most part, disagreeing only twice that factors were neutral rather than weighing against removal (Honora's emotional, physical, and developmental needs, and Honora's relationship with her parents). We also found the final factor, not addressed by the district court, favored removal. Therefore, overall, the quality of life factors tipped against removal and we cannot say the district court abused its discretion when considering these factors.

### (iii) Impact on Noncustodial Parent's Visitation

The final consideration in the best interests of the child analysis is the effect of the relocation on the noncustodial parent's ability to maintain a meaningful parent-child relationship. See *McLaughlin v. McLaughlin*, 264 Neb. 232, 647 N.W.2d 577 (2002). This effect must be viewed in light of the court's ability to devise reasonable parenting time arrangements. See *id*.

Ahkeshia realizes that regardless of how the matter was decided, Honora would be spending time with the noncustodial parent "fewer times per year but in larger increments." Brief for appellant at 34. That had certainly been Ahkeshia's experience since her move to Idaho. Understandably, Ahkeshia had not exercised the physical parenting time granted to her every other weekend under the temporary order.

Since her move to Idaho, Ahkeshia had visited Nebraska in April and May 2016, for about 1 week each, during which she spent time with Honora. Honora stayed with Ahkeshia in Idaho for 4 continuous weeks that summer. Other than that, she did not have physical contact with Honora until she arrived in Nebraska for trial. There had been a plan for Ahkeshia to have physical parenting time with Honora over Christmas 2016, but it did not happen as Ahkeshia was 9½ months pregnant with Honora's half-brother at the time. Ahkeshia's more regular parenting time with Honora happened via cell phone or "Facetime" calls about three times per week. Ahkeshia's

parenting time under the modified parenting plan entitled her to about the same time as she had exercised from March 2016 to trial.

Michael was accustomed to having frequent parenting time with Honora throughout her life. His parenting role had only increased since the time that Ahkeshia moved to Idaho. The record shows that there would have been a negative effect on Michael's ability to maintain the same meaningful parent-child relationship he had enjoyed with Honora if Honora were to relocate to Idaho. This factor weighs against removal.

### (c) Did District Court Abuse Its Discretion?

This case presented a difficult decision regarding removal. The parties' motivations in seeking or opposing removal were neutral as were several of the quality of life factors. However, overall, the quality of life factors weighed against removal. And the third consideration, the impact the move would have on contact between Michael and Honora, also weighed against removal. Where, as here, both parents demonstrated favorable qualities as parents, the district court's decision could have gone either way. Under such circumstances, we cannot say that the district court abused its discretion in denying Ahkeshia's request to remove Honora to Idaho.

### 2. CHILD SUPPORT

Ahkeshia believes the calculation of child support was inequitable because it did not factor in any deviations. She was ordered to pay $330 per month in child support, beginning September 1, 2017. Although the evidence showed that Michael's net income for 2016 was around $25,000 (about $11,000 from his new company and the rest from his prior employment), Michael said he had "a lot of start-up costs" for his company and anticipated making more money from his company in the future. His 2015 tax returns showed an adjusted gross income of $41,961; his proposed child support calculation used that amount for his income. The district court's child support calculation used $3,497 per month as his monthly income. The evidence showed Ahkeshia made $11.50 per hour and her counsel had stated that she worked 40 hours per week; Ahkeshia agreed that she earned between $5,000 and $6,000 a year from the Army. The district court's calculation set Ahkeshia's monthly income at $2,500 per month. Ahkeshia received a credit of $187 for the health insurance premium she continued to pay for Honora.

The paramount concern and question in determining child support, whether in the initial marital dissolution action or in the proceedings for modification of decree, is the best interests of the child. *Gangwish v. Gangwish*, 267 Neb. 901, 678 N.W.2d 503 (2004). The main principle behind the Nebraska Child Support Guidelines is to recognize the equal duty of both parents to contribute to the support of their children in proportion to their respective incomes. *Gangwish v. Gangwish, supra*. In general, child support payments should be set according to the Nebraska Child Support Guidelines, which compute the presumptive share of each parent's child support obligation. *Gangwish v. Gangwish, supra*. A deviation in the amount of child support is allowed whenever the application of the guidelines in an individual case would be unjust or inappropriate. See *Pearson v. Pearson*, 285 Neb. 686, 828 N.W.2d 760 (2013). Deviations from the guidelines must take into consideration the best interests of the child. *Id.*; Neb. Ct. R. § 4-203 (rev. 2011).

Specifically, Ahkeshia claims that the district court should have granted her deviations in consideration of her other children, her extended summer parenting time with Honora, and the transportation costs related to exercising her parenting time.

(a) Ahkeshia's Other Biological Children

As relevant here, credit may be given for biological or adopted children for whom the obligor provides regular support. Neb. Ct. R. § 4-205(E) (rev. 2016). The trial court has discretion to choose whether and how to calculate a deduction for subsequent children. *Schwarz v. Schwarz*, 289 Neb. 960, 857 N.W.2d 802 (2015). When the court decides to allow a deduction, the calculation is left to its discretion so long as it considers the obligations to both families and the income of the subsequent child's other parent. *Id.* No precise mathematical formula exists for calculating child support when subsequent children are involved, but the court must perform the calculation in a manner that does not benefit one family at the expense of the other. *Id.* The party requesting a deduction for his or her obligation to support subsequent children bears the burden of providing evidence of the obligation, including the income of the other parent of the child. *Id.*

Ahkeshia argues she should have been given a deviation for being financially responsible for her and Luis' two children born after Honora. While the evidence did not show that Luis was under a "legal obligation," brief for appellant at 35, such as a child support order to support those children, Ahkeshia testified that she and Luis had combined their incomes since their move to Idaho to support their children. From Ahkeshia's own testimony, she and Luis both financially contributed to the regular support of their children. However, while Ahkeshia's paystubs and individual tax returns were received into evidence, there is no evidence about Luis' income. Nor is there evidence of the amount required to regularly support their children. Ahkeshia had the burden to present that evidence. See *Schwarz v. Schwarz, supra*. Moreover, her proposed child support calculation did not include a deduction for regular support for other children. We cannot say the district court abused its discretion by not granting Ahkeshia a deviation for her support of her and Luis' two children.

(b) Extended Summer Parenting Time

The guidelines indicate that abatement of a child support obligation may be appropriate during periods of extended parenting time. Neb. Ct. R. § 4-210 states, in relevant part:

> Visitation or parenting time adjustments or direct cost sharing should be specified in the support order. If child support is not calculated [pursuant to a joint custody order], an adjustment in child support may be made at the discretion of the court when visitation or parenting time substantially exceeds alternating weekends and holidays and 28 days or more in any 90-day period. During visitation or parenting time periods of 28 days or more in any 90-day period, support payments may be reduced by up to 80 percent.

Ahkeshia asserts that such an abatement should have been made in light of her extended parenting time with Honora from June 1 through July 31 each year, which is a total of 61 continuous days of parenting time. That parenting time exceeds 28 days in a 90-day period and therefore § 4-210 provides for a reduction of support payments by up to 80 percent during that

time. However, § 4-210 does not mandate any adjustment. Given that the distance between Idaho and Nebraska will reduce more regularly scheduled parenting time between Ahkeshia and Honora during the other 10 months of the year, this will result in Michael shouldering increased financial responsibilities during those other months. We cannot say the district court abused its discretion by not deviating from the guidelines in consideration of Ahkeshia's extended parenting time each summer.

### (c) Transportation Costs

Ahkeshia complains that the district court did not allow a deviation in child support for transportation costs. Section 4-210 provides that the court may deviate from the guidelines when a parent must pay substantial and reasonable long-distance transportation costs directly associated with parenting time. There was evidence that the parties had agreed during mediation that they would meet halfway in Denver to exchange Honora for all holidays and parenting time. The district court ordered that all transportation costs related to effectuating the parenting time schedule were to be equally shared by the parties. Under those circumstances, we cannot say the district court abused its discretion by not granting Ahkeshia a deviation in child support for transportation costs.

### 3. ATTORNEY FEES AND COSTS

Ahkeshia claims the district court erred by failing to award her attorney fees and costs. Her counsel's affidavit was received into evidence during the March 25, 2019, hearing on her motion to compel, showing legal fees and costs totaling $4,782.75. Attorney fees relate to Ahkeshia's motion for a new trial, her first appeal, and her motion to compel and the March 25 hearing. Costs relate to Ahkeshia's first appeal.

Attorney fees and expenses may be recovered only where provided for by statute or when a recognized and accepted uniform course of procedure has been to allow recovery of attorney fees. *Moore v. Moore*, 302 Neb. 588, 924 N.W.2d 314 (2019). Attorney fees and costs are statutorily allowed in paternity and child support cases. *Coleman v. Kahler*, 17 Neb. App. 518, 766 N.W.2d 142 (2009) (citing to Neb. Rev. Stat. § 43-1412(3) (Reissue 2008) and *Cross v. Perreten*, 257 Neb. 776, 600 N.W.2d 780 (1999)). In *Cross v. Perreten, supra*, the Nebraska Supreme Court affirmed a district court's award of attorney fees in a paternity action, finding that Neb. Rev. Stat. §§ 43-512.04(5) and 43-1412(3) (Reissue 1998) "specifically provide that attorney fees and costs are allowed in paternity and child support cases brought by a child's mother, father, guardian or next friend, the county attorney, or other authorized attorney." *Cross v. Perreten*, 257 Neb. at 783, 600 N.W.2d at 786. Also, attorney fees and costs shall be awarded against a party who alleged a claim or defense that the court determined was frivolous, interposed any part of the action solely for delay or harassment, or unnecessarily expanded the proceedings by other improper conduct. Neb. Rev. Stat. § 25-824(4) (Reissue 2016).

When an attorney fee is authorized, the amount of the fee is addressed to the trial court's discretion, and its ruling will not be disturbed on appeal absent an abuse of discretion. *Gonzalez v. Union Pacific RR. Co.*, 282 Neb. 47, 803 N.W.2d 424 (2011).

Ahkeshia argues that if Michael's counsel would have complied with the order to prepare a parenting plan and timely submitted the same, it would have saved her time and expense. Under

the 2017 partial modification order, Michael's counsel was to prepare a parenting plan for submission to the court for its signature. Michael's counsel failed to do that before Ahkeshia filed her motion for a new trial and her first appeal. Arguably, Ahkeshia's action in filing an appeal before the parenting plan was submitted and approved by the district court also contributed to the delay in the underlying proceedings. It appears that both parties' counsel contributed to the delay in this action related to the parenting plan and securing a final, appealable order. We cannot say that the district court abused its discretion by not awarding Ahkeshia her requested attorney fees and costs.

## VI. CONCLUSION

We affirm the district court's August 22, 2019, order which fully incorporates the August 3, 2017, modification order and subsequently filed parenting plan.

AFFIRMED.