IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

PRELLWITZ V. HELMS

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

KYLE J. PRELLWITZ, APPELLANT,

V.

CASEY J. HELMS, APPELLEE.

Filed August 30, 2022.    No. A-21-708.

Appeal from the District Court for Webster County: TERRI S. HARDER, Judge. Affirmed.

Jeffrey P. Ensz, of Lieske, Lieske & Ensz, P.C., L.L.O., for appellant.

Kay M. Strong Prather, of Prather Law Office, for appellee.

MOORE, RIEDMANN, and WELCH, Judges.

MOORE, Judge.

## I. INTRODUCTION

Kyle J. Prellwitz appeals from the order of the district court for Webster County which modified a prior custody determination by awarding physical custody of the parties' daughter to her mother, Casey J. Helms, who lives in Kansas. For the reasons set forth below, we affirm.

## II. STATEMENT OF FACTS

These proceedings involve Rylan, born in May 2014. Casey is Rylan's biological mother, who resides in Linn, Kansas, and Kyle her biological father, who resides in Red Cloud, Nebraska. Casey and Kyle have never been married to each other.

### 1. PROCEDURAL HISTORY

In September 2019, Casey and Kyle entered into a stipulation concerning custody of Rylan. Previous custody orders are not a part of our record. As part of the 2019 stipulation, they agreed that Kyle would maintain physical custody of Rylan and that Casey would be awarded liberal

- 1 -

parenting time. On September 23, 2019, the district court entered an order reflecting the terms of the parties' stipulation.

On August 17, 2020, Casey filed a complaint to modify that custody arrangement, as well as a verified motion for ex parte orders. Casey's verified motion for ex parte orders alleged that Kyle had left his marital home, was experiencing depression, was abusing alcohol, had left Rylan in the care of Kyle's wife, and had not seen Rylan for more than a month. Casey further alleged that Kyle had abandoned Rylan, and requested that she be awarded temporary physical custody and permission to remove Rylan to the State of Kansas. Attached to Casey's motion was a copy of a text message from Kyle's wife, Jessica, to Casey. The text message reads in relevant part:

I keep asking [K]yle to come over so we can have a talk with [R]ylan and explain things. I'm pretty sure he's drinking right now.

. . . I told [Kyle's mother that] [K]yle hasn't been over to the house to play with his kids for about a month now. It's almost like we are a burden to him. That's why I think he's going through a depression. I'm not ever going to be upset that [R]ylan is here. I want her here. But I want [K]yle to be involved. . . .

In her complaint to modify, Casey alleged that a material change of circumstances had occurred since she entered into the 2019 custody agreement with Kyle. Specifically, she alleged that Kyle had abandoned Rylan in the home he shared with his wife, that Kyle had failed to communicate with Casey, that Kyle had failed to provide physical care for Rylan in more than a month, and "for other reasons" outlined in Casey's verified motion for ex parte orders. Casey alleged that it is in Rylan's best interests that her "emergency, temporary, and long term custody" be placed with Casey. Casey requested that she be awarded legal and physical custody of Rylan, that Kyle be ordered to pay child support, that Kyle pay Casey's attorney fees, and that she be granted permission to move Rylan to Kansas.

The district court issued an ex parte order on August 17, 2020. The court found that "an emergency does exist" and that it was in Rylan's best interest to be placed in Casey's temporary care. The court also found that Casey had alleged a legitimate reason to relocate Rylan to Kansas, pending additional orders of the court. A further hearing on the matter was scheduled for the following month, to be conducted by affidavit only.

Following a hearing on September 21, 2020, the district court entered an order on September 23. The court found that it was in Rylan's best interests to remain in the temporary custody of Casey. The court noted that Rylan was "thriving" at her elementary school in Kansas, Casey provided an "intact family" while Kyle was separated from his wife, and Kyle's drinking remained a concern for the court.

The district court further observed that Kyle's drinking had been an issue "since the inception of this case." The court referenced its previous orders in 2014, including that Kyle obtain an alcohol evaluation and obtain an interlock device for his motor vehicle. These orders do not appear in our record. Kyle's and Jessica's affidavits both stated that Jessica's text message to Casey was taken out of context, but neither refuted the authenticity of the message. Despite Kyle's denial that his alcohol consumption was problematic, the court found that Kyle did have alcohol issues. Moreover, the court noted that Kyle had delegated much of Rylan's care to Jessica so that he may participate in his various jobs and recreational interests. The court concluded that Kyle "must

address the alcohol issues and marital problems at final hearing to retain primary physical custody."

The district court allowed Rylan to remain in Kansas, reasoning that Linn was only a 2-hour drive from Red Cloud. The court further ordered that Kyle was entitled to the parenting time originally offered to Casey in the 2019 stipulated agreement and required that he obtain a current alcohol evaluation. The court made no findings as to whether a material change in circumstances had occurred.

In the summer of 2021, hearings were held on Casey's request to modify custody. At the hearings, Kyle and Casey presented evidence about their relationship with Rylan and about their current circumstances.

## 2. KYLE'S EVIDENCE

Kyle testified that he gained physical custody of Rylan when she was 3 months old. A few months later, Kyle began dating Jessica. Jessica testified that she is a preschool teacher and provided child care for Rylan after her school days and during her holiday breaks. Jessica and Kyle moved in together before Rylan was 2 years old and married when Rylan was 5 years old. Jessica described them as a "go, go, go family" that enjoys being involved in the community and going on special outings. Kyle works fulltime at an auto repair shop, is the captain of the Red Cloud fire department, referees for various high school sporting events, and coached Rylan's T-ball team. Jessica is a fulltime teacher and coaches high school volleyball.

### (a) Marital Issues

In the spring of 2020, Kyle and Jessica had their first child together. Jessica testified that around the birth of their son and the beginning of the COVID-19 pandemic, Kyle began drinking more frequently and exhibiting symptoms of depression. Jessica and Kyle began arguing and "butting heads a lot," and the couple decided to separate in July. Kyle acknowledged that his increased drinking exacerbated the marital issues.

Jessica and Kyle agreed that Kyle would move out of the home and stay with a family member and that Rylan would stay with Jessica in the marital home. Jessica testified that she and Kyle planned to create a sense of normalcy, so that Rylan would be unaware that Kyle was not living in the home. Kyle likewise stated that he did not want the separation to feel "abnormal" for Rylan. At the time of the separation, Rylan was about to start first grade in Red Cloud and Kyle thought it would be easier to keep Rylan in her usual home environment.

Kyle did not inform Casey about his separation or that he was living apart from Rylan. Kyle believed that it "wasn't any of [Casey's] business." Kyle explained that he spent the evenings at the marital home with Rylan and that he trusted Jessica to keep Rylan safe.

In August 2020, Jessica testified that Casey sent her a text message inquiring whether Jessica and Kyle had separated. Jessica identified the message attached to Casey's verified motion for ex parte orders as the message she sent confirming the separation. Jessica felt that her text message was an "exaggeration," as "Kyle would come over and visit as often as he would like."

(b) Alcohol Evaluation

Per the order of the district court, Kyle completed an alcohol evaluation in October 2020. Jamie Babutzke, a mental health practitioner and licensed alcohol and drug counselor, conducted Kyle's intake assessment.

Babutzke testified that Kyle was "unsure as to why he needed a substance use evaluation" as he stated to Babutzke that, 5 years ago, his two driving under the influence offenses had been pled down to willful reckless driving. Kyle additionally told Babutzke that he did not believe he had an alcohol problem. Babutzke noted that Kyle had scored an 11 on the Michigan Alcoholism Screening Test, indicating that he was in the high risk range to have a problem with alcohol. Babutzke also believed that Kyle may have suffered from a lack of insight as to how alcohol was affecting his relationships.

Kyle allowed Babutzke to speak with Jessica as part of his intake assessment. Jessica reported to Babutzke that Kyle began drinking heavily in June 2020 and continued until August. Jessica described Kyle's routine as drinking on "Wednesdays, Thursdays, Fridays, and Sundays until very drunk, at least 6 to 18 beers." Jessica told Babutzke that she believed Kyle should participate in an alcohol treatment program.

Babutzke diagnosed Kyle with a mild alcohol use disorder. Babutzke identified the symptoms of Kyle's disorder to be his alcohol tolerance level, unsuccessful efforts to cut down or control use, use in hazardous situations, and continued use despite relationship problems. Babutzke recommended that Kyle participate in Stage of Change group therapy to address his motivation for alcohol use, and the Circle of Security parenting class to understand how his behaviors affected Rylan.

Brianna McMaster, an outpatient therapist, testified that she began working with Kyle in December 2020. Kyle approached McMaster for therapy based on the recommendations of his alcohol evaluation. After an individual counseling session, McMaster enrolled Kyle in a Stage of Change group. McMaster described Kyle as being proactive in his treatment, and that he seemed genuine in his engagement in sessions. McMaster stated that Kyle was able to take accountability for the role that alcohol played in his marital discord and his temporary loss of Rylan's custody. Kyle also reported to McMaster that he was reducing his alcohol usage. In addition to participating in five Stage of Change group sessions, Kyle had four individual counseling sessions with McMaster.

McMaster testified that she believed Kyle possessed the necessary skills to control his alcohol use and consume responsibly. McMaster wrote a discharge letter in March 2021, noting that Kyle had successfully completed the recommendations in his alcohol evaluation and that there were "no concerns to report."

Kyle testified that he had completed the Circle of Security parenting class and a certificate of completion was entered into evidence.

Jessica testified that she and Kyle reconciled shortly after the temporary custody hearing in September 2020. Kyle moved back into the marital home and Jessica reported that his drinking has "significantly" decreased. Kyle testified that he continues to drink alcohol in social situations.

On cross examination, Jessica was asked to identify photographs in which she and Kyle were consuming alcohol. The photographs were of Kyle and Jessica drinking at various social

outings including their wedding reception, tailgating, golfing, horse races, and concerts. Jessica noted that some of the photographs were taken a number of years before the trial. Jessica further testified that when the couple drinks, they arrange for Rylan to be cared for by another adult.

### (c) Coparenting

Jessica testified that she is a "very organized person" and so manages various household tasks involving Rylan. Jessica confirmed that she takes Rylan to medical appointments, to haircuts, plans her birthday parties, handles payment for her dance recital tickets, and communicates with Casey regarding visitation exchanges. Jessica also took Rylan to get her ears pierced. Jessica agreed that she fills out Rylan's school records and then presents them to Kyle for his signature. However, Jessica also testified that Kyle attends Rylan's events, such as parent/teacher conferences and dance recitals.

Jessica further stated that she has a better rapport with Casey than Kyle does and feels "like I can handle a situation better." Jessica noted that it is easier to communicate directly with Casey, and "rather than making Kyle be the middle man of our communication, I just simply text her or call her when needed."

Jessica's mother testified that Jessica was primarily responsible for Rylan's daily care in the summer of 2020 when Kyle was living out of the marital home. However, both Kyle and Jessica testified that they are equal partners and share the responsibilities of parenting as a team. When asked what kind of tasks Kyle takes on to care for Rylan, he stated that he helps Rylan put her laundry away and gets her bath ready.

### (d) Rylan's Life in Red Cloud

Rylan attended preschool and kindergarten at Red Cloud Public Schools. Jessica described the class full of girls as friends who have grown up together and who are "all very close, very active together." Rylan's kindergarten teacher testified that Rylan is a sweet child and well-liked by teachers. Rylan's kindergarten teacher observed that she did well academically, had many friends, and demonstrated kindness toward students with special needs in her class. When Rylan's kindergarten class moved to remote learning due to the COVID-19 pandemic, Rylan completed all of her school work on time.

In addition to many friends, Rylan also has several family members in Red Cloud. Kyle's mother and grandmother live in the area, as well as Jessica's mother, who acts as another grandmother to Rylan. Casey's grandmother, aunt, and father also live in or around Red Cloud. Rylan has a half-brother, Kyle's and Jessica's son, who lives in Red Cloud.

Kyle testified that Rylan is a great kid, who is smart, funny, and "sometimes annoying." He described Rylan's favorite activities as golfing with him; playing with her brother, dolls, and friends; and riding her bike. Kyle enjoys taking Rylan swimming, playing board games, and practicing her softball pitching.

### 3. CASEY'S EVIDENCE

Casey testified that she has lived in Kansas for the last 5 years. She has been married to her husband, Jeremy, for 4 years and they have four children in their blended household: Rylan, Casey's other daughter, Jeremy's daughter, and Casey's and Jeremy's son. The three girls in the

home are close in age and are all on the same week-to-week visitation schedule, so that they are in Casey's and Jeremy's home at the same time. Casey has been a stay-at-home mother for the last 4 years.

### (a) Reaction to Kyle's Separation

After hearing rumors that Kyle and Jessica were divorcing, Casey contacted Kyle directly in early August 2020, to ask if he had moved out of the marital house or if he was separating from Jessica. Casey testified that Kyle told her that "none of that was true and that everything was fine."

During a visitation exchange on August 14, 2020, Casey learned from Jessica that Kyle had moved out of the home and was not helping care for Rylan or his son. That weekend, Casey noticed that Kyle was at a family member's home while he was on a video call with Rylan. When Casey informed Jessica of the unusually short video call between Kyle and Rylan, Jessica responded with the text message that Casey later attached to her verified motion for ex parte orders. Casey testified that she sent the text message to Jessica because she was concerned that Rylan was living with a stepparent, rather than her father.

Casey filed her verified motion and complaint to modify the day after her text message exchange with Jessica.

### (b) Coparenting

Casey testified that it is common for Kyle to defer to Jessica to make logistical arrangements regarding Rylan. Casey's testimony on the subject is largely consistent with Jessica's.

Casey testified that she is willing to share Rylan's medical information with Kyle and Jessica, but that she does not feel as though Kyle keeps her appropriately updated. Casey recounted an incident when Rylan was injured by a bat at a T-ball game in Linn and had to go to the emergency room for stitches. Casey called Kyle after she and Rylan left the emergency room to inform him of Rylan's injury. However, after Rylan was injured in a trampoline accident in Red Cloud, Jessica called Casey to inform her of the injury. Kyle did not join the call at any point.

Casey testified that Kyle will delegate items to Jessica, despite Casey communicating directly with Kyle. Casey provided the example of informing Kyle, during his period of separation from Jessica, that Rylan needed to have a wart removed. While Kyle told Casey he would make the appointment to have the wart removed, it was Jessica who took Rylan to the doctor and later communicated with Casey about the removal. A few months later, Casey asked Kyle to monitor Rylan's first dental filling, but he did not respond to her. Text messages submitted into evidence show that Casey and Jessica later communicated about Rylan's filling.

### (c) Rylan's Life in Linn

During the year Rylan temporarily resided with Casey, she was enrolled in first grade at an elementary school in Linn. Casey testified that Rylan loves her new school and her teacher, who she will have again for second grade. Rylan is in the same class as two of her cousins on Jeremy's side, and Rylan's half-sister will attend the same school next school year.

In addition to Rylan's half-siblings in Casey's home, Casey's mother, Jeremy's mother, and Jeremy's sister and her children live in or near Linn.

Casey testified that as a stay-at-home mother, she has the availability to provide physical and emotional care for Rylan. She transports Rylan to and from school and takes her to various medical appointments.

At Casey's home, Rylan likes to spend time outside gardening or playing with the family's farm animals. Rylan also plays with her half-sister and step-sister. The girls do arts and crafts together, including sewing. Rylan also participates in a dance class.

While Casey acknowledged that Rylan was established in Red Cloud prior to the district court granting Casey temporary physical custody, Casey testified that it would be in Rylan's best interests to stay in Linn.

### 4. DISTRICT COURT'S ORDER

On August 2, 2021, the district court found that Casey had proven a material change in circumstances and that it was in Rylan's best interests to be in Casey's physical custody. The court also allowed Rylan to be removed to Kansas. The court noted that it had considered the evidence in light of statutory factors and case law on both custody modification and removal. The court did not state what material change in circumstances existed or provide factual findings related to Rylan's best interests. Because the court was motivated to enter an order prior to the start of the school year, it acknowledged that its order was "not lengthy."

Kyle appeals.

## III. ASSIGNMENTS OF ERROR

Kyle assigns, restated, that the district court erred in modifying the previous child custody order on both a temporary and permanent basis.

## IV. STANDARD OF REVIEW

Modification of a judgment or decree relating to child custody, visitation, or support is a matter entrusted to the discretion of the trial court, whose order is reviewed by an appellate court de novo on the record, and will be affirmed absent an abuse of discretion. *Lindblad v. Lindblad*, 309 Neb. 776, 962 N.W.2d 545 (2021). When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than the other. *Id*.

## V. ANALYSIS

### 1. TEMPORARY CUSTODY ORDER

Kyle first assigns that the district court erred in ordering a temporary modification of Rylan's custody. Kyle contends that the court's temporary child custody determination did not comport with the applicable statutory requirements.

Before we are able to address the merits of this assignment of error, we must determine whether this court has jurisdiction. Before reaching the legal issues presented for review, it is the duty of an appellate court to determine whether it has jurisdiction over the matter before it. *Humphrey v. Smith*, 311 Neb. 632, 974 N.W.2d 293 (2022). For an appellate court to acquire jurisdiction of an appeal, there must be a final order entered by the court from which the appeal is taken. *Id*. The order granting Casey temporary custody and permission to move Rylan to Kansas

is now moot. The issue of whether a temporary order was granted in error is only relevant from the time it was ordered until it was replaced by the order determining Rylan's permanent custody placement. See, *Pathammovong v. Pathammovong*, 268 Neb. 1, 679 N.W.2d 749 (2004). See, also, *Coleman v. Kahler*, 17 Neb. App. 518, 766 N.W.2d 142 (2009). We recognize that trial courts are discouraged from granting temporary permission to remove children to another jurisdiction prior to a ruling on permanent removal. *Id.*; *Wild v. Wild*, 15 Neb. App. 717, 737 N.W.2d 882 (2007). As we note below, the unique timing of the events leading to the ex parte and temporary orders and the commencement of Rylan's school year compelled the trial court to issue the temporary order placing custody with Casey and allowing her to move Rylan to Kansas.

Regardless, we cannot afford relief to Kyle from the court's temporary order as the issues are now moot. We need not further address this assigned error.

## 2. FINAL CUSTODY ORDER

Kyle also assigns that the district court erred in ordering a permanent modification of Rylan's custody, and removal of Rylan to Kansas. Kyle notes that it is difficult to challenge the district court's final order because the court "supplied very little in the way of findings." Brief for appellant at 18. However, he contends that there was not a material change in circumstances, the evidence at trial did not demonstrate Rylan's quality of life to be better in Kansas than in Nebraska, and Rylan's removal had a negative impact on his parenting time.

In cases where a noncustodial parent is seeking sole custody of a minor child while simultaneously seeking to remove the child from the jurisdiction, a court should first consider whether a material change in circumstances has occurred and, if so, whether a change in custody is in the child's best interests. If this burden is met, then the court must make a determination of whether removal from the jurisdiction is appropriate. See, *Burton v. Schlegel*, 29 Neb. App. 393, 954 N.W.2d 645 (2021); *State on behalf of Savannah E. & Catilyn E. v. Kyle E.*, 21 Neb. App. 409, 838 N.W.2d 351 (2013).

### (a) Material Change in Circumstances

In cases involving the modification of child custody, a material change of circumstances constituting grounds for modification means the occurrence of something which, had it been known to the dissolution court at the time of the initial decree, would have persuaded the court to decree differently. *Burton v. Schlegel, supra*. If a permanent, as opposed to temporary, order changing custody is to be made, it should appear to the court that the change of circumstances is more or less permanent or continuous and not merely transitory or temporary. *Weaver v. Weaver*, 308 Neb. 373, 954 N.W.2d 619 (2021).

In Casey's complaint to modify, she alleged that Kyle had abandoned Rylan with Jessica, that Kyle had failed to communicate with Casey, that Kyle had failed to provide physical care for Rylan in more than a month, and she alluded to her allegations regarding Kyle's depression and alcohol issues in her verified motion for ex parte orders. The district court also noted in its temporary order that Kyle needed to address his alcohol issues and marital problems to retain physical custody of Rylan.

In its final order, the district court found that Casey had proven a material change in circumstances, however, the court did not make specific findings regarding the alleged facts

relevant to the change in circumstances. If findings are not made, this court can make little application of our general rule that in our de novo review, we consider, and may give weight to, the fact that the trial court saw and heard the witnesses. See *Lindblad v. Lindblad*, 309 Neb. 776, 962 N.W.2d 545 (2021). But, to the extent there was a conflict in the evidence, it does appear that the district court found Casey more credible than Kyle.

Upon our de novo review of the record, we find support for the district court's determination that a material change in circumstances had occurred since the entry of the last custody order.

In August 2020, Kyle left Rylan in the care of his estranged wife without communicating such with Casey. The record indicates that Kyle's increased use of alcohol was a significant concern during this period of time. Our case law demonstrates that an increase or escalation in parental behavior that affects the best interests of the child can support a judicial finding that there has been a material change in circumstances, even if there is some evidence of similar behavior in the past. See *Lindblad v. Lindblad, supra.* Although the marital separation which began between Kyle and Jessica during this time was temporary, testimony at trial evidenced that Kyle has often delegated Rylan's care and communication with Casey to Jessica in the past. Even so, Kyle leaving Rylan in Jessica's care, after he moved out of the marital home without Rylan, was an escalation of Kyle's previous behavior. Additionally, not only did Kyle fail to communicate this change to Casey, but he was dishonest with Casey when Casey asked him directly whether or not he had moved out of the marital home. We acknowledge that Kyle desired privacy during the period of his separation from Jessica. However, as Rylan's mother, Casey was entitled to communication regarding who was providing primary care for Rylan. Thus, Kyle's leaving Rylan in Jessica's care during their separation and failing to communicate with Casey amounted to a material change in circumstances.

Following the temporary order, Kyle did eventually comply with the court order to obtain an alcohol evaluation. While Kyle originally lacked insight as to why his participation in an alcohol evaluation was necessary, he nonetheless initiated treatment with an outpatient therapist upon the recommendations of his evaluation. McMaster testified that Kyle was genuinely engaged in therapeutic sessions and noted that she had no concerns regarding Kyle's alcohol usage at the time of his discharge. In addition to participating in individual therapeutic sessions with McMaster, Kyle also completed the two classes recommended by his alcohol use evaluation. Both Kyle and Jessica reported a significant decrease in Kyle's alcohol consumption and the two had reconciled by the time of trial. Again, although Kyle's issues with alcohol and his marital discord were somewhat temporary, because they necessitated a change in temporary custody and removal to Kansas in order for Rylan to begin the school year, we determine that these factors do support, in part, finding that a material change in circumstances had occurred. We acknowledge that some of the evidence regarding the change in circumstances occurred following entry of the temporary order and during the year that Rylan was in Casey's custody prior to the final hearing. Again, the change in temporary custody was necessitated by Kyle's actions in August 2020 and the proximity to the start of the new school year. The evidence during this temporary period shows that Rylan was well cared for while living with her mother in Kansas. In conclusion, we cannot say that the district court abused its discretion in finding that there was a material change in circumstances affecting the best interests of Rylan.

(b) Best Interests

The next inquiry is whether Rylan's best interests compel a change of custody.

Neb. Rev. Stat. § 43-2923(6) (Reissue 2016) provides that in determining custody and parenting arrangements:

[T]he court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of . . . :

(a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;

(b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;

(c) The general health, welfare, and social behavior of the minor child;

(d) Credible evidence of abuse inflicted on any family or household member . . . ; and

(e) Credible evidence of child abuse or neglect or domestic intimate partner abuse.

Other pertinent factors include the moral fitness of the child's parents, including sexual conduct; respective environments offered by each parent; the age, sex, and health of the child and parents; the effect on the child as a result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and parental capacity to provide physical care and satisfy educational needs of the child. *Burton v. Schlegel, supra.*

Rylan has a loving relationship with both of her families in Red Cloud and Linn. Both Casey and Kyle have a positive relationship with Rylan and enjoy spending time with her. Both home environments support Rylan's educational needs and various activities.

While Rylan is well cared for in both homes, we again note that Jessica provides most of Rylan's care while she is in Red Cloud. Testimony at trial demonstrated that Jessica takes Rylan to medical appointments, plans outings, and manages the logistics of co-parenting with Casey. Casey is a stay-at-home mother and has the ability to provide physical care for Rylan herself.

Additionally, Rylan had already lived in Linn for a year at the time of trial. Rylan has acclimated to a new school, made friends, and established a routine with her siblings. While Rylan had spent the majority of her life in Red Cloud, she appears to be doing well in Linn and it would be disruptive for Rylan to move back to Red Cloud.

For these reasons we find it is in Rylan's best interests to remain in Casey's physical custody.

(c) Removal From Jurisdiction

In relocation cases, a parent must first satisfy the court that he or she has a legitimate reason for leaving the state. See *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999). We have previously held that when a noncustodial parent, who has resided in another state for several years, seeks physical custody a minor child, the noncustodial parent has demonstrated a legitimate reason for relocation. See *Burton v. Schlegel*, 29 Neb. App. 393, 954 N.W.2d 645 (2021); *State on behalf of Savannah E. v. Kyle E.*, 21 Neb. App. 409, 838 N.W.2d 351 (2013). Because Casey is

- 10 -

seeking physical custody of Rylan and has resided in Kansas for several years, we find that Casey demonstrated a legitimate reason to relocate Rylan.

Once the threshold burden of showing a legitimate reason for leaving the state has been met, the court then determines whether removal to another jurisdiction is in a child's best interests, which in turn depends on (1) each parent's motives for seeking or opposing the move, (2) the potential the move holds for enhancing the quality of life for the child and the custodial parent, and (3) the impact such a move will have on contact between the child and the noncustodial parent, when viewed in the light of reasonable visitation arrangements. *State on behalf of Savannah E. & Catilyn E. v. Kyle E., supra.*

### (i) Each Parent's Motives

The ultimate question in evaluating the parties' motives is whether either party has elected or resisted a removal in an effort to frustrate or manipulate the other party. *McLaughlin v. McLaughlin*, 264 Neb. 232, 647 N.W.2d 577 (2002).

Both parents care about Rylan's well-being and there are legitimate reasons for opposing and supporting removal. Kyle's motive for opposing Rylan's relocation is based on his desire to maintain Rylan's routine and community in Red Cloud, as well as foster a relationship between Rylan and his son. Casey wishes to exercise more parenting time with Rylan and asserts that her schedule better accommodates Rylan's needs. Casey likewise seeks to foster a relationship between Rylan and the other children in her household. We cannot find that either parent's motive in requesting or opposing removal was adverse to Rylan's best interests.

### (ii) Quality of Life

In determining the potential that the removal to another jurisdiction holds for enhancing the quality of life of the parent seeking removal and of the child, we have previously considered several pertinent factors, including: (1) the emotional, physical, and developmental needs of the child; (2) the child's opinion or preference as to where to live; (3) the extent to which the relocating parent's income or employment will be enhanced; (4) the degree to which housing or living conditions would be improved; (5) the existence of educational advantages; (6) the quality of the relationship between the child and each parent; (7) the strength of the child's ties to the present community and extended family there; (8) the likelihood that allowing or denying the move would antagonize hostilities between the two parties; and (9) the living conditions and employment opportunities for the custodial parent because the best interests of the child are interwoven with the well-being of the custodial parent. *Kashyap v. Kashyap*, 26 Neb. App. 511, 921 N.W.2d 835 (2018). See *Farnsworth v. Farnsworth, supra*. This list should not be misconstrued as setting out a hierarchy of factors. *Kashyap v. Kashyap, supra*. Depending on the circumstances of a particular case, any one factor or combination of factors may be variously weighted. *Id*.

Rylan's quality of life is high in both Red Cloud and Linn. In both locations, she has siblings and members of her extended family. She has done well at both elementary schools she has attended. Rylan has easily transitioned between both homes for most of her life.

While Rylan has a positive relationship with both Casey and Kyle, we again note that Casey is more available to provide physical care to Rylan. Additionally, Casey has made more of an effort to communicate with Kyle regarding Rylan's medical information and updates. Although

we note that Jessica has provided good care to Rylan, Rylan's quality of life may be somewhat improved by having her mother, rather than a stepparent, provide the majority of her physical care.

*(iii) Impact on Noncustodial Parent*

This factor is usually of paramount concern when a child is being relocated some distance away from the noncustodial parent. See *State on behalf of Savannah E. v. Kyle E.*, 21 Neb. App. 409, 838 N.W.2d 351 (2013). This was not the issue here, because the parties now live about 110 miles apart. This distance has not affected the current custodial and parenting arrangements and a change in the custodial arrangements would not detrimentally impact Kyle's ability to have meaningful parenting time.

Upon our de novo review, we find no abuse of discretion in the district court's decision to allow Casey to move Rylan to Kansas.

## VI. CONCLUSION

Upon our de novo review of the record, we find that the district court did not abuse its discretion in awarding Casey physical custody of Rylan and allowing her to remove Rylan to Kansas.

AFFIRMED.